# CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY v. POLLOCK.

Pleading—Amendment to Conform to Proof—Appeal and Error—Railroads—Common Carriers—Transportation of Live Stock—Delivery—Loading—Liability for Loss—Conflicting Evidence—Credibility of Witness—Province of Jury.

1. Where an amendment to a pleading might have been allowed to correspond with the facts proven, a judgment will not be disturbed because no formal amendment was made.
2. Recovery being sought for an alleged failure of a carrier to transport two out of a number of horses alleged to have been delivered, the petition alleged that the defendant, through a named employee, loaded the horses upon defendant's cars. *Held,* that such averment would not prevent a recovery for a loss of the horses between the time of delivery and loading, it appearing from the evidence that defendant was not misled, and the petition, if its interpretation was doubtful, might have been amended to conform to the facts.
3. The liability of a carrier as such commences at the time of delivery and acceptance of the property for shipment.
4. By the acceptance on the part of defendant carrier of a delivery for transportation of plaintiff's horses, then in a pen of defendant's stock yards, the latter became liable from that time as carrier, notwithstanding that prior to such delivery plaintiff's horses were held in the pen subject to his personal control, under an arrangement with a third party having the temporary use of the yards for a public horse sale.

(11)

5. Though the plaintiff had for a time been using a pen in the stock yards of defendant carrier for holding his horses, with personal control over them, neither he nor the carrier was prevented by that fact from changing the situation, and entering into an arrangement for the delivery in the same pen of the horses for transportation. Whether such a change was accomplished was a question of fact for the jury.

6. Where a carrier undertakes to discharge the duty of loading live stock without notice to the shipper or his agent, it will be liable if negligent in the performance of the act, notwithstanding a stipulation in the contract of shipment requiring the loading to be done by the shipper.

7. It is the province of the jury to pass upon conflicting evidence as to the number of horses delivered to a carrier for shipment, and the credibility of witnesses is especially a matter for their consideration.

[Decided February 10, 1908.]                    (93 Pac., 847.)

ERROR to the District Court, Sheridan County, HON. CARROLL H. PARMELEE, Judge.

F. G. Pollock sued to recover from the Chicago, Burlington & Quincy Railroad Company, for the loss of two horses which, it was alleged, the company had failed to transport as a common carrier according to contract. From a judgment in favor of plaintiff, the defendant prosecuted error. The facts are stated in the opinion.

*Lonabaugh & Wenzell* and *N. K. Griggs*, for plaintiff in error.

Though the bills of lading, mistakenly issued by the agent without any personal knowledge on his part, show 56 horses, that only only 54 went into the cars is proven, (1) by the evidence of Dodge, who did the loading and who alone speaks as to this; (2) by the admitted facts that none escaped or could have escaped from the cars, yet 54 head only were found at the unloading at Alliance; (3) by the statement of plaintiff himself, who, after having gone with the horses to Alliance, said that he had no reason to think

that any of them got out of the cars on the way there; (4) by the explicit finding of the jury that the 2 horses in question were neither loaded into nor escaped from the cars. But, should we concede that the 56 horses were actually in pen No. 23, on the evening of the day of shipment, this would not aid plaintiff, for then the result would be that 2 of them escaped, or were taken from his pen, where, under the decisions, he, and not defendant, had to take the chance of loss, as the pen was not under the control of defendant, but of another, and plaintiff's horses while therein were subject to his disposal. (R. R. Co. v. Riley, 27 A. & E. R. R. Cas., 49; R. R. Co. v. Hunter, 18 id., 527; R. R. Co. v. Powers, 103 N. W. (Neb.), 678; Ry. Co. v. Byrne, 100 Fed., 359.)

The misconduct of counsel, when the court sustained an objection to a question put on cross-examination to one of defendant's witnesses, in stating that if permitted he would prove it, was prejudicial, and entitles defendant to a new trial. The question was intended to reflect upon the witness, and the counsel's conduct was such as is held to entitle a party to a new trial even though the court at once does everything possible to nullify the effect of the wrong. (Nelson v. Welch, 115. Ind., 273; Cosselman v. Dunfee, 65 N. E., 494; People v. Davey, 72 id., 245; Cook v. Com., 76 id., 666; Bullard v. R. R. Co., 64 N. H., 323; Jaques v. R. R. Co., 41 Conn., 61.) Plaintiff has, by his pleading, narrowed this case to very small limits. The default he alleges against defendant is alone the latter's failure to transport. Indeed, his petition, in express terms, says that we did load the horses; it does not say that we did not do so, nor that they were lost before loading by any act of defendant. When the case came to trial, the issues changed entirely from those made by the pleadings. By the petition we were called upon to defend upon the ground that we had loaded the horses into the cars and then lost them. The case as made, and as specifically found by the jury, was not charged at all. In truth, there was no evidence whatever

even tending to support the negligence alleged against us, there being as to this an entire failure of proof. Upon the case made by the pleadings we were entitled to an instructed verdict in defendant's favor, the rule being universal that the proof must correspond with and support the default as alleged; hence it was error for the court to refuse the motion made for such instructed verdict.

*Robert P. Parker*, for defendant in error.

The evidence establishes a delivery of 56 horses, and the agent made out the contract for that number without plaintiff's assistance. It is true that petition alleges that defendant loaded the horses into the cars, but that allegation was made solely for the purpose of meeting the recitation in the contract of shipment that plaintiff should load and unload, and to show that defendant had waived that obligation on part of plaintiff by itself loading the car, and thus exempting plaintiff from the consequences of a negligent loading. (Normile v. R. & N. Co., 69 Pac., 930.) The question of variance was fully presented to the court below, and defendant held not to have been misled. The alleged misconduct of counsel was not preserved by being stated as a ground in the motion for new trial, and cannot, therefore, be here considered. The plaintiff, a shipper, having shown delivery to the defendant, a common carrier, and having shown a loss, the carrier is liable unless it brings itself within the excepted causes or exception by contract. (6 Cyc., 519.)

POTTER, CHIEF JUSTICE.

The defendant in error, who will be referred to as the plaintiff, his title in the district court, brought this action to recover the value of two horses, alleged to have been delivered to and received by the plaintiff in error, defendant below, to be transported by it, as a common carrier, from Sheridan, in this state, to Hammond, Indiana, under two separate contracts, or bills of lading, each providing for the

transportation of twenty-eight horses, and it is alleged that, in violation of the defendant's said contracts, it failed to transport the whole number of horses as thereby agreed respectively, but that it transported from Sheridan twenty-seven horses only of the number covered by each contract. The answer alleges that twenty-seven horses only were in fact delivered and received under each contract, and that the number was mistakenly entered in each as twenty-eight in consequence of plaintiff's erroneous statement to the defendant respecting the number. The principal issue to be tried, therefore, was whether the two horses in question had been delivered and received for such shipment.

That the defendant is a common carrier, operating a railroad running through Sheridan County, in this state, is admitted by the pleadings. It appears from the evidence that there was but a single delivery of horses for the shipment aforesaid, that is to say, all the horses then proposed to be shipped by the plaintiff were delivered at one and the same time, but they were loaded into two cars, and a separate contract was made for the horses in each car. The plaintiff owned all the horses and was named as consignee in each contract, and as the shipper in one of them. In the other contract one W. P. Palmer was named as shipper, and his name is subscribed to that contract. That appears to have been done to enable said Palmer to accompany the plaintiff with the horses, he having been employed, as plaintiff testified, to assist with the horses after their arrival at destination. This seems to explain the reason for the making of two contracts instead of one. They are alike in their terms except as to the name of the shipper and the number of the car containing the horses. Each contract contains the following stipulation: "It is agreed that the said animals are to be loaded, unloaded, watered and fed by the owner or his agents in charge; that the second party (the carrier) shall not be liable for loss from theft, heat or cold, jumping from car, or other escape, injury in loading or unloading, injury which animals may cause to themselves or

to each other, or which results from the nature or propensities of such animals." It is also stated in each contract that, in consideration of free transportation for one person to accompany the stock, "it is agreed that the said cars, and the said animals contained therein, are and shall be in the sole charge of such persons, for the purpose of attention to and care of the said animals, and that the railway company shall not be responsible for such attention and care." The sum of $121 is stated in each contract and alleged in the petition as the freight rate to be paid for the agreed transportation.

Notwithstanding the stipulation in the contracts as to loading the animals, the petition alleges and the evidence shows that the loading was done by an employee of the defendant, the foreman of its stock yards at Sheridan, the point of shipment; and from the evidence it appears that such loading occurred during the absence of the plaintiff. The discrepancy between the number of horses stated in the contracts and way-bills and the number actually in the cars was noticed when the train carrying the horses reached Alliance, Nebraska, on the defendant's railroad. The horses were unloaded there during the night of their arrival and but twenty-seven were found to be in each car by the foreman of defendant's stock yards at that point, who assisted in unloading them, and the next morning, the horses having remained there until then, the plaintiff saw and counted the horses and discovered the discrepancy between the number stated in the contracts and which he claims to have been delivered, and the number being transported. He thereupon at once made and filed a claim for the alleged missing horses with the defendant's representative at Alliance, which was referred to the defendant's freight claim agent. Thereupon some correspondence occurred between the latter and the plaintiff, resulting in an offer of settlement at a stated figure by said claim agent, but which offer plaintiff did not accept. That correspondence was introduced in evidence. Whatever the loss or escape, therefore, it occurred, if at all, be-

fore the unloading of the horses at Alliance, so far as the evidence is concerned.

The jury returned a general verdict for the plaintiff, assessing the damages at $160, with interest; and with their verdict returned answers to certain special interrogatories that had been submitted at defendant's request. Answering the special interrogatories, the jury found that the two horses in controversy had not escaped from defendant's cars; that they were in the same pen at the stock yards with the other horses at the time the plaintiff directed or authorized the loading of his stock into defendant's cars; and that they escaped or were lost between the time of turning over the stock to defendant and the loading into defendant's cars, through the negligence of defendant's employees.

A motion for judgment in favor of defendant, notwithstanding the verdict was denied, and thereafter defendant's motion for new trial was also denied; whereupon judgment was rendered for the plaintiff upon and in accordance with the verdict for the sum of $203.30, that being the amount of damages assessed by the jury, with legal interest from the day next succeeding the execution of the contracts and the alleged delivery of the horses, together with costs of suit. The defendant complains here of that judgment on error.

The following grounds of error are relied on in the brief of counsel for the defendant, plaintiff in error here:

1. That the evidence fails to establish the cause of action alleged. 2. That the evidence fails to show negligence on the part of defendant. 3. That plaintiff is not shown to be entitled to recover. 4. That the court erroneously excluded from the evidence the official report of the sheriff's inspection of the horses shipped by the plaintiff. 5. Alleged misconduct of plaintiff's counsel during the trial.

1. It is contended in the first place that upon the allegations of the petition and the special findings of the jury the plaintiff is not entitled to recover anything. This conten-

tion is based upon the finding that the horses were lost or escaped between the time that they were turned over to defendant and the time that they were loaded, which is claimed to be inconsistent and at variance with the allegation of the petition that the horses were loaded upon the cars of the defendant by an employee of defendant. In the cause of action upon one of the contracts, after alleging the delivery and acceptance of twenty-eight horses for transportation, it is alleged "that said defendant, through its employee, one Gill Dodge, loaded said horses upon the cars of said defendant." In stating the cause of action upon the other contract a similar allegation appears. The breach of each contract is alleged to have been the failure to transport and convey the horses in accordance with its said contracts. Upon this it is argued that negligence before or during loading is not charged, and that the verdict appears, therefore, to have been founded upon a liability not alleged in the petition. One of the grounds contained in the motion for new trial was that of surprise based on the facts aforesaid, and an alleged lack of advice and knowledge on the part of the defendant that an attempt would be made to show negligence prior to the loading of the horses.

A literal reading of the allegation as to loading might perhaps throw the petition open to the technical construction that it states that all the horses delivered had been actually loaded upon the cars of defendant. Though the contract stipulation requiring the shipper to load was not alleged, it is probable, as suggested in the brief for defendant in error, that the allegation that the horses were loaded by the defendant was inserted to show a waiver of the agreement in that regard; and that the intention was merely to allege that the act of loading was performed by the defendant instead of the plaintiff, and thus to open the way to recover for a loss shown to have occurred while the horses were being loaded. And this we are inclined to think is the sense in which the averment ought to be construed, in view of all the allegations of the petition. There is at least

no harm in adopting that construction, since it is clearly a matter that was capable of amendment without changing the cause of action, and the circumstances are such as to render the variance, if any, immaterial; a question that we will now proceed to consider. Recovery was sought for an alleged failure to transport two horses alleged to have been delivered and accepted for that purpose.

The statute provides that no variance between allegation and proof shall be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits, and when it is alleged that a party has been so misled, that fact must be proved to the satisfaction of the court, and it must also be shown in what respect the party has been misled, whereupon the court may order the pleading to be amended upon such terms as are just; and when the variance is not material the court may direct the fact to be found according to the evidence, and may order an immediate amendment without costs. (Rev. Stat. 1899, Secs. 3736, 3737.) When the allegation to which the proof is directed is unproved, not in some particular or partculars only, but in its general scope and meaning, then it is not a case of variance, but a failure of proof. (Id., Sec. 3738.) Where an amendment might have been allowed to correspond with the facts proven, a judgment will not be disturbed because no formal amendment was made. (Kuhn v. McKay, 7 Wyo., 42.)

Now, the whole transaction, including the circumstances of the delivery of the horses, the time of such delivery, the number of the horses when taken in charge by the defendant, and when loaded, the method employed in loading, the chances of escape after the time plaintiff claimed to have made the delivery, and apparently everything connected with the transaction as well before as after the alleged delivery, was gone into by both parties upon the trial. Defendant's representative in receiving and loading the horses was a witness for the defendant, and he was examined at length concerning the entire matter. The district court

must have taken these facts into consideration in deciding the motion for new trial; and we fail to observe any reasonable ground for holding the defendant to have been misled by the allegation referred to, or any ground for assuming that it could have more fully presented its case or the facts to meet a claim of liability at any time following the alleged delivery.

Moreover, the instructions given to the jury, apparently without objection, presented the case as one for an alleged liability between the time of delivery and leaving Sheridan. For example, the fourth instruction charged the jury that "in no view of the case can plaintiff be held to recover in this action for the horses in question, or either of them, unless he shall have established by preponderance of the evidence, that he absolutely did deliver such horses, or horse, to defendant for actual shipment." Now, there could be no question about delivery after the loading. The sixth instruction stated that under the petition no question is raised as to loss or escape at any other point than Sheridan, and that the jury were not at liberty to find against defendant because of any evidence tending to show the loss or escape of the horses at any point other than Sheridan. None of the other instructions sought to distinguish between a loss before and after loading. The defendant complains of the refusal to give its requested instruction number seven, but it is not in the record, and we are in no way informed as to what was stated by it. Should there be any reasonable doubt, therefore, as to the interpretation of the allegation in question, we think it is clearly one which the court might have ordered to be amended to conform to the facts; and that the alleged variance was not of such a character as to amount to a failure of proof.

2. The evidence was conflicting in regard to the number of horses delivered. Each contract or bill of lading called for twenty-eight, as well as each way bill; these were made out by the agent of defendant at Sheridan, and the plaintiff testified that he did not state the number to the agent, and

there was no evidence that he made any statements or representations as to number to such agent. He did testify, however, that he had fifty-six horses, and that he delivered all of them to the defendant for shipment; and he introduced in evidence the sheriff's certificate of inspection made at or about the time of the alleged delivery, showing the inspection of fifty-six horses for the plaintiff, "destination Hammond, Ind., shipped car 61357, 52585 Q." According to the contracts and way bills, the cars containing the horses were numbered 61357 and 62585. The sheriff may have made a clerical mistake in the number of one of the cars, or the mistake may be in the copy in the bill of exceptions. However, the discrepancy is not material to the controversy here, since there is no evidence of any other shipment at the time in question, and the discrepancy does not seem to have been mentioned at the trial.

At the time that plaintiff claims by his testimony to have dellvered the horses for shipment, they were, whatever their number, in one of the pens at defendant's stock yards at Sheridan, the particular pen being numbered 23 adjoining the loading chute or pen, or rather separated therefrom only by an alley sixteen feet wide, a gate of the same width as the alley when closed separating the pen from the alley.

It appears that during several days immediately preceding this shipment a public horse sale had been conducted at said stock yards by one A. B. Clarke, who had been given the use of the stock yards for that purpose, except that the company reserved the right to use portions thereof if necessary for the unloading of animals from its cars while passing through Sheridan, and possibly for horses turned over to it at that point for shipment. While Mr. Clarke was using the yards as aforesaid, he or his agents allotted a certain pen or pens to respective buyers, into which the horses bought from time to time by them were put. Under this arrangement the plaintiff was assigned the temporary use of pen 23, and the horses purchased by him were placed in that pen. During such sale, however, and while the pens

were so used, that is to say, as a place for keeping the horses purchased, the pens so employed were under the exclusive control of the person conducting the sale, or his agents, so far as the company was concerned, and the horses might be taken out and others put in, without control or interference by the railway company. The plaintiff testified that he bought fifty-six horses, obtaining all but one at the sale aforesaid, and that the one not so obtained was bought from a party in Sheridan and put in the same pen with the others; that at about six o'clock in the evening of the day of shipment while such horses were in the pen aforesaid, he counted them, and there were fifty-six; that he then turned them over to the company for said shipment, and the company accepted them. That he thereupon went into town to attend to some business, returning at about seven o'clock, when he was informed by the agent that they had loaded his horses, and he was given the bills of lading. It does not appear that he made any further count of the animals that day.

The representative of the company who loaded the cars testified that he loaded all the horses that were in the pen used by plaintiff sometime between seven and nine o'clock in the evening; that he drove the horses out of the pen into the chute pen, counting them as they passed through the gate into the alley connecting with the chute pen; that there were fifty-four head, which he divided into two lots of equal number, and loaded them in separate cars. He stated that the night was dark and rainy, and that he used a lantern, but he believed he was able to make a correct count. He denied giving the number of horses to the agent, or to having any knowledge as to where the agent obtained his information respecting the number. It appears from his testimony that the officer who inspected the horses was there at the time he commenced loading, and though he admitted having known at some time that fifty-six were claimed to have been inspected, and seems to have gained that information from the officer, he was unable to recall

whether or not he had learned that fact at the time of the loading, but admitted that the officer may have told him at that time. He had the key to the outside gate of the yards, and testified that he did not let anyone out with any of the plaintiff's horses after they had been turned over to him, and that he did not think it was possible for any of the horses to have escaped or to have been stolen while being loaded.

In addition to the testimony of the plaintiff above mentioned, he was recalled on rebuttal and then testified that the representative of the company to whom he had delivered his horses was the foreman of the stock yards, the witness who testified to having done the loading; that the horses were in the pen aforesaid when so delivered, and that the delivery occurred immediately after he had received the certificate of inspection. It appears that the inspection was made by a deputy sheriff, and the plaintiff testified that upon his return from town when he found the contracts prepared and ready for signature, the inspecting officer was with the agent, which may perhaps account for the agent's information as to the number of horses.

Neither the party who was agent at the time nor the officer who made the inspection appears to have been called as a witness or to have testified. But an affidavit, or apparently a portion of one, made by the absent officer was permitted to be read by consent, subject to objection as to relevancy. In that affidavit which was offered by defendant it was stated that after the date of the shipment the affiant saw in a stable at Sheridan one of the animals claimed by the plaintiff to have been shipped and lost, but there is nothing in the evidence to connect the plaintiff with the act of placing the animal there, or to show that he knew of its having been there.

Though the witness who had attended to the loading stated that the company had nothing to do with the horses while in pen 23, it appears from his own testimony that they were in that pen when he took charge of the horses as the company's representative, for he testified that he drove the

horses out of the pen in loading them. The evidence show-
ing that before the loading the plaintiff left the yards, and
that he did not return until the loading had occurred is not
disputed. It is clear, therefore, since he left the horses in
the pen where they had been kept, and they were loaded
without further act on his part, that it is a reasonable con-
clusion that they had been delivered before he left the stock
yards, and, therefore, while in the pen. Though the com-
pany would not have been liable under the circumstances
for losses had any occurred during the period that the
horses were kept in the stock yards before actual delivery
and acceptance for shipment, the fact that others previously
had the temporary use of the yards does not exempt the
company from liability as a common carrier after accepting
possession for the purpose of transportation. The liability
of the carrier as such commences at the time of delivery
and acceptance of the property for shipment. (5 Ency. L.
(2d Ed.), 181, 446; Hutchinson on Carriers (2d Ed.),
Sec. 82.) In a recent Nebraska case the rule was stated to
be well established as follows: "When a shipper surrenders
the entire custody of his goods to a common carrier for im-
mediate transportation, and the carrier so accepts them, the
liability of the carrier as a practical insurer of the safe de-
livery of the goods at once attaches." (Chicago, B. & Q.
R. Co. v. Powers, 103 N. W., 678.) Notwithstanding, there-
fore, that the horses had been kept in the yards one or two
days or more under conditions during that period imposing
no responsibility upon the carrier, when, if ever, though
without change of location, the horses were actually sur-
rendered into the possession and control of the carrier, and
the latter so accepted them for transportation, the previous
facts became of no consequence, except as bearing upon
the question of the time of delivery, and when the liability
as carrier began. It is clear that, although the plaintiff
had for a time been using a pen in the yards of the company
for holding his horses, with personal control over them,
neither he nor the company was prevented by that fact from

changing the condition of affairs, and entering into an arrangement for the delivery in the same pen of the horses for transportation. Whether such a change was accomplished was a question of fact for the jury to determine.

The testimony of the defendant's superintendent at Sheridan at the time of the shipment, does not, as contended, establish the fact that this particular lot of horses could not have gone into the company's possession until they were in the chute or loading pens. It does not appear by his testimony or otherwise that he gave any personal attention to this shipment. His testimony was directed generally to the arrangement with Mr. Clarke in relation to the use of the yards during the sale; and he stated that as no shipments had been previously booked for those days he had turned over the yards to Clarke for the purposes already stated, and that, in case of a proposed shipment while Clarke had control of the yards, the company would then have arranged with him about that, so as not to interfere with his sale. And in referring to the matter generally the witness stated that the company had nothing to do with the horses connected with the Clarke sale when they were put into the various pens, nor until their going into the chutes or loading pens, but that until then they could be handled in any way, driven away or shipped, and when put into the loading pens, they were then loaded in the car for the company. In making these statements it is clear that he was not referring specifically to this particular shipment, but to the situation generally resulting from the use of the yards for the Clarke sale. He was not examined about the specific facts connected with the delivery of plaintiff's horses, nor does he appear to have been present or to have had any personal knowledge about that delivery. Had there been an absence of any evidence tending to show a surrender of possession to the company before the horses entered the loading pens, the general situation would no doubt have controlled. We do not think his testimony or the facts testified to by him rendered it impossible for a delivery to

have occurred while the horses were in pen 23. The testimony of the plaintiff and the foreman of the stock yards presented the facts to the jury respecting this particular shipment, and the time and manner of delivery therefor, a matter not touched upon specifically by the superintendent's testimony. Whether the Clarke sale had been closed at the time of this shipment is not clearly disclosed, though the inference is strong that it had. At any rate, it would seem that the plaintiff's connection with the sale had ceased, and that he was prepared to arrange for the shipment of his horses.

There was some evidence to the effect that one horse bought by plaintiff at the Clarke sale had been put into another pen, and had been seen in the neighborhood of Sheridan after the shipment, but plaintiff testified to having rejected that horse and to have excluded it in stating the number of horses he had purchased; moreover, it appears to have been a different animal from either of the two alleged to have been missing. Under the contracts, which seem to have been completed and signed after the loading, the shipper agreed to load and unload; but the defendant voluntarily did the loading, and under such circumstances as to constitute a waiver of the contract stipulation, so far as to render it liable for negligence on its part in performing the act if resulting in loss or damage. We understand the rule to be that where a carrier undertakes to discharge the duty of loading live stock without notice to the shipper or his agent, it will be liable if negligent in performance of the act, notwithstanding a stipulation in the contract requiring the loading to be done by the shipper. (Normile v. R. & Nav. Co. (Ore.), 69 Pac., 928; C., B. & Q. R. Co. v. Williams (Neb.), 85 N. W., 832 (55 L. R. A., 289); Norfolk & W. R. Co. v. Sutherland, 89 Va., 703; Mo. Pac. R. Co. v. Kingsbury (Tex.), 25 S. W., 322.) The rule is certainly a reasonable one under circumstances such as are presented in the case at bar. It is not clear whether the special finding that the loss occurred between the time of

delivery and loading refers to the time when the loading was begun or completed. If the latter was intended, then the rule above stated would apply.

The instructions seem to have fairly presented the law upon the issues, and are not here complained of, but we refer to them to show how the case went to the jury. They stated in substance that if but twenty-seven horses were in fact delivered to the company to be placed in each of the two cars, then the fact that the contracts mistakenly stated that twenty-eight were shipped in each would be immaterial, and the case should then be considered as though the contract read twenty-seven instead of twenty-eight; that while the horses were under plaintiff's control in the pen mentioned in the evidence, they could not be regarded as delivered to defendant; that a recovery could not be had unless an actual delivery of the alleged missing horses to the defendant was established; that if the horses were in a pen belonging to defendant, but only for the convenience of plaintiff in holding them or otherwise, then they were not delivered to defendant so as to make it liable for loss or escape therefrom. By reason of the peculiar language of the petition in stating that the defendant transported only twenty-seven horses from Sheridan, the jury was instructed that no question was raised as to loss or escape at any point other than Sheridan.

The following instruction was requested by defendant:

"You are instructed that as the plaintiff has declared, in his petition, upon the contracts of shipment, and also himself introduced said contracts in evidence, he is bound by their terms; and hence, as said contracts expressly state, among other things, that the defendant shall not be liable for the escape from defendant's cars of the horses in question, you cannot render a verdict against it for damages, on account of such escape, even though you should be satisfied from the evidence that they did so escape."

This was modified by adding the following: "Provided, however, that such escape was made without negligence on

the part of the defendant or its employees," and as so modified was given. Though the modification was complained of in the motion for new trial, it is not shown to have been excepted to, and we do not understand that it is now claimed to have been error.

The evidence being conflicting upon the question of the number of the horses, it was the peculiar province of the jury to pass upon it; and they seem to have done so by harmonizing as much of the evidence as possible. It must be remembered that the contracts were in evidence, and they would control in the absence of evidence deemed sufficient to overcome their recitals. If the testimony of plaintiff was to be believed, then the contracts correctly stated the number. There were some other circumstances in evidence corroborative of his testimony. There were others opposing it; such as the improbability that more than twenty-seven head actually went into either car, and the testimony of the witness who loaded the horses that he found only fifty-four, and that he loaded all that were in pen 23. The jury may have thought it possible for the two to have escaped after delivery and inspection and before the beginning of loading; in which case the testimony of said witness, as well as the plaintiff, may have been given credence. Defendant's evidence tended strongly, if not conclusively, to show that no escape had occurred between Sheridan and Alliance, hence the instruction restricting the liability to loss at Sheridan does not seem to have eliminated any chances of plaintiff's recovery upon the evidence. Though conflicting, the evidence appears to be sufficient to sustain the verdict. We cannot substitute our judgment for that of the jury, even if we should feel inclined to look at the effect of the evidence differently. The credibility of the witnesses was especially a matter for the consideration of the jury. We are, therefore, of the opinion that the claim as to insufficiency of the evidence is not supported upon the record.

3. The other alleged errors are not properly before us, not having been assigned as grounds for new trial. But

we are inclined to think that the exclusion of the sheriff's office record and his monthly report as to the inspection of these horses, made by authority of Chapter 79, Laws of 1901, was proper, or at least not prejudicial. The purpose of the offer was to show that as appeared by such record and report only fifty-five horses had been inspected, excluding the rejected horse above referred to; and as a witness connected with the sheriff's office was permitted to state the fact shown by the record by referring to it, not to refresh his recollection, but by way of stating the total number, shown by the record to have been inspected on the occasion in question, prejudice is not quite apparent. But the shipper and carrier have nothing to do with the making of the record or report; and it was not shown nor offered to be shown that the plaintiff against whom they were sought to be introduced was present when they were made or had assisted in making them, or knew until they were produced at the trial what the contents were. As written evidence for the purpose aforesaid upon the issues here between the shipper and carrier, they would appear to be objectionable on the ground of hearsay.

For the reasons aforesaid no reversible error is perceived in the record, and the judgment will be affirmed.

Beard, J., and Scott, J., concur.            *Affirmed.*