C. J. BROWN AND DENNIS CARRUTHERS,

*Plaintiffs and Respondents.*

vs.

WYOMING BUTANE GAS COMPANY, INC.,

a Wyoming Corporation,

*Defendant and Appellant*

(No. 2407; April 12th, 1949; 205 Pac. (2d) 116).

68

For Plaintiffs and Respondents the cause was submitted on the brief and oral argument of W. J. Wehrli of Casper, Wyoming.

For Defendant Appellant the cause was submitted on the brief and oral argument of Edward E. Murane of Casper, Wyoming.

## OPINION

RINER, Chief Justice.

This proceeding is before the Court upon a direct appeal from a judgment of the District Court of Natrona County entered upon the verdict of a jury in an action brought by C. J. Brown and Dennis Carruthers, plaintiffs in the District Court, respondents here, against Wyoming Butane Gas Company as defendant, now the appellant, to recover for damages incurred in a collision between plaintiffs' gas truck and semi-trailer tank equipment and defendant's Butane truck and semi-trailer outfit, also consisting of a truck and tank semi-trailer. The plaintiffs' unit was forty-two feet long, was loaded, carried five thousand gallons of gas and was proceeding in a southerly direction. It will usually be hereinafter referred to as the "gas tanker." The defendant's unit was thirty-five feet in length, was traveling empty and moving in a northerly direction. It will usually be mentioned subsequently as the "Butane tanker." The parties to the action may be conveniently designated as aligned in the trial court. The accident occurred when these two units undertook to pass each other on a bridge located approximately five to seven miles south of the Town of Glendo, Wyoming on Highway 87, March 27, 1947 about five o'clock

in the morning, and when it was still dark. This bridge was forty-five feet long and the useable roadway width thereon was eighteen feet nine inches. The bridge had iron posts along each of its sides set in concrete shoulders which were raised above the useable roadway about a foot in height.

Plaintiffs' petition charged the defendant with negligence in four particulars. These were, to state them briefly: That the defendant's unit was on its left or wrong side of the highway at the time the collision occurred; that the brakes on defendant's unit were defective and insufficient; that the driver of the Butane tanker was traveling at such a fast rate of speed that he did not have proper control over his truck and trailer; and that defendant's driver violated a custom prevalent with operators of transports hauling liquid fuels upon the highway involved by giving a signal with his head lights, turning them off and on, thereby according plaintiffs' unit the right of way over said bridge, and then, disregarding the signal he had thus given, proceeded towards and upon the bridge with the consequent collision with and damage to plaintiffs' equipment.

Defendant's answer denied these allegations of negligence and pleaded as an affirmative defense that while its Butane truck was being driven in a safe, prudent and careful manner, the accident in question was caused by plaintiffs' driver's negligence in that he failed to keep his unit to the right of the center of the highway, the center of which was marked with a yellow line, but instead crossed over that line and collided with the defendant's equipment; that the brakes of plaintiffs' unit were defective and insufficient to control it; and that said driver did not have a proper control over his gas tanker due to the fast rate of speed he was traveling and the insufficiency of his brakes. Plaintiffs filed a reply in the nature of a general denial.

As above stated the cause was tried before the court with a jury in attendance. At the conclusion of the plaintiffs' case and also at the conclusion of the introduction of all the evidence in behalf of both parties, defendant moved for a directed verdict in its favor. Each of these motions was denied. The record shows an exception taken by the defendant to the denial of the first motion but apparently not to the second. The jury returned a verdict for the plaintiffs in the sum of $6,108.16 which had been shown by plaintiffs' repair bills stipulated by counsel to be the reasonable value and customary price thereof and for this amount the judgment in question was given.

We must examine the evidence in this case in the light of certain rules of law which have been invoked in this jurisdiction for many years and which accord with appellate practice in this country generally.

In Northwest States Utilities. Co. vs. Brouilette, 51 Wyo. 132, 65 Pac. 2d. 223 the defendant presented a motion at the close of plaintiff's case for an instructed verdict in its favor; also a similar motion at the close of all the evidence in the case; for a judgment, notwithstanding the verdict; and finally a motion for a new trial. All these were denied, error was claimed on account of the adverse rulings, and this was said in response:

"When a request is made to the court to wrest a case from the decision of the jury and direct the verdict or to enter judgment in opposition to the verdict, the principles of law upon which the decision of the court must be based are clear. In the first place, the credibility of the witnesses and the weight of their testimony are for the jury alone to determine. C. B. & Q. R. Co. v. Pollock, 16 Wyo. 321, 93 Pac. 847. Again, a motion for judgment at the close of plaintiff's case is in the nature of a demurrer to plaintiff's evidence, and admits its truth for the purpose of the motion. Boyle v. Mountford, 39 Wyo. 141, 270 Pac. 537. Further, where there

is a substantial conflict in the evidence, it is improper for the court to direct a verdict. Weaver v. Richardson, 21 Wyo. 158, 129 Pac. 828. In 64 C. J., 432-433, the rule is stated in this language:

" 'By moving for a directed verdict, the maker of the motion admits the truth of whatever competent evidence the opposing party has introduced, . . . not only of all that the testimony proves, but of every material or ultimate fact which it tends to prove, . . . together with all fair and reasonable inferences or conclusions of fact favorable to the adverse party, fairly or reasonably inferable or deducible therefrom by a jury.'

"In case of Willis v. Willis, 48 Wyo. 403, 429, 49 P. (2d) 670, it is said:

" 'In this connection (where it is claimed the judgment is not sustained by sufficient evidence) it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.' "

The judgment below was affirmed.

Substantially similar rules were announced in Blackstone vs. First National Bank of Cody, 64 Wyo. 318, 192 Pac. 2d 411 where a motion for a directed verdict was sustained and the action of the trial court in so doing was upheld on appeal proceedings here.

It will not be necessary to review all the evidence either on behalf of the plaintiffs or what was submitted on behalf of the defendant where it is not in conflict with that for the plaintiffs, but enough of it will be given to make it clear whether the trial court erred in ruling as it did on the motions for a directed verdict, whether the verdict is supported by substantial evidence, and whether the evidence in the record on the issues raised is in substantial conflict.

Relative to the charge of negligence made by each party against the other that the equipment of each was on the wrong side of the highway at the time of the impact of the two vehicles:

Without objection or exception thereto by either plaintiffs or defendant herein the Court gave to the jury Instruction No. 7 which reads as follows:

"YOU ARE INSTRUCTED that the laws of the State of Wyoming provide:

"1. No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent under the conditions then existing.

"2. Whenever any person, traveling with any vehicle or conveyance on any road or public highway in this state, shall meet another vehicle or conveyance traveling in an opposite direction it shall be the duty of the driver of such vehicle or conveyance to turn promptly to the right of the center of the traveled road and to remain on the right of the center of the traveled road until such vehicle or conveyance has passed.

"YOU ARE FURTHER INSTRUCTED that any violation of any of the statutory requirements hereinabove set out may be considered by you as evidence of negligence, but you will not be justified in finding a verdict against the defendant on account of such negligence unless you are convinced by a fair preponderance of the evidence that the violation of the statute was the proximate cause of the collision."

The plaintiffs introduced in part the following testimony: Washburn, the driver of plaintiffs' gas tanker said that the condition of the road from the Town of Douglas (a municipality located on Highway 87 approximately twenty-seven miles north of Glendo, Wyoming) to where the accident took place was icy; that he drove onto the bridge and his unit was practically through the bridge, the tractor part of his equipment being across the bridge when either the defend-

ant's trailer or the latter's tractor wheels struck plaintiffs' unit, wrecked it, and threw it off the road; that the impact broke the housing of the rear axle carrying dual tires and left them in the center of the road; that plaintiffs' unit went off the east side of the road and turned over; that at the point where the accident occurred the highway was all ice; that after the accident witness could not see any wheel marks on the surface of the highway because it was all ice; that the drive shaft of the defendant's truck is practically in the center of the vehicle when it is in operative condition; that the drive shaft when thus operating extended from a point at the rear of the engine to the differential, i.e., to the drive wheels; that the mark or gouge made by defendant's truck's drive shaft (which had been pulled from its front socket by the collision) on the highway was between two and two and a half feet from the highway's center yellow line and on the Butane tanker's side, or east side of the highway; that there were several of those marks or gouges to be seen on the bridge extending to the point where the Butane tanker went off the road on the east side thereof, its driver's right side; that at the time of the collision, plaintiffs' unit was on his, the right hand side of the road, and just as close as he dared run against that rim on the bridge (the concrete shoulder mentioned above) ; that the collision took place on the south end of the bridge, witness' unit being fifteen to twenty feet through the bridge; that the tractor of defendant's Butane truck passed the tractor or truck of the gas tanker without collision; that the driving wheels at the rear of defendant's tractor on the Butane truck, the driver's left side, hit the left side of witness' equipment; that the trailer of witness' unit had tandem dual wheels i.e., eight of them.

On cross examination this witness also said that his unit did not come in contact with the front end of the

Butane tanker; that there was no snow on the bridge; that there was snow in the adjoining fields; that he has driven a tanker for about twelve years. On recall this witness stated further that from his observation of the Butane tanker as it approached, whether it was empty or not could not be ascertained but he was told after the collision happened that it was empty.

Dennis Carruthers, one of the plaintiffs, testified in his own behalf that there were two drive wheels on each side of the tractor truck of the gas tanker, a dual wheel on each side; that there were two axles on his trailer, with two wheels at each end of those axles, so that there were eight wheels on the trailer and six on the tractor; that the overall outside width of that equipment was just under eight feet; that witness came to the scene of the accident about nine or ten A.M., March 27, 1947; that he saw no tire marks on the pavement; that he saw a crease made by the drive shaft on the Butane truck which was a foot past the center of the bridge to the north on the Butane unit's side of the road; that this crease was about two and a half feet from the yellow line on the east side thereof; that this drive shaft was located near the center of the Butane unit and is the shaft that runs from the transmission to the differential that does the pulling; that when these two units hit, that pulled the driving wheels back and pulled the drive shaft out of its front socket; that this drive shaft left a mark gouged into the oiled surface of the highway at several places up to where it stopped; that the Butane tanker had similar equipment with witness' gas tanker as to its being a truck with a tank or trailer attached; that both the Butane unit and the gas unit were each just under eight feet in width.

As opposed to the foregoing testimony, we find several of defendant's witnesses stating that the

gouge mark made by the drive shaft of the Butane tanker was fifty-five inches from the east lip or shoulder of the bridge. As the bridge was concededly two hundred twenty-five inches wide in roadway, half thereof, where the centering yellow line was located, would be one hundred twelve and a half inches from that lip. Subtracting from that number the two feet or two feet and a half, i.e., twenty-four or thirty inches as testified to by plaintiffs' witnesses, the gouge mark was thereby located from eight-two and a half to eighty-eight and a half inches west of said eastern lip or shoulder. The testimony is undisputed that the drive shaft was under the center of the Butane tanker, and if, when pulled out of its socket it fell, due to the force of gravity, directly to the roadway, as the triers of the facts in the case had a right to infer, then as to the fifty-five inch location of the gouge mark, that would place the Butane truck on its own or right side of the highway but as to the eighty-two and a half or eighty-eight and a half inch location, that would place the Butane truck on the western or wrong side of the highway, that unit being about ninety-six inches wide, half thereof being, of course, forty-eight inches.

There was testimony also by defendant's witnesses that the tracks of the plaintiffs' gas tanker's tires were found on the north side of the bridge in such a position from the western lip or shoulder of the bridge that they angled easterly across the bridge, thereby affording the inference on the part of the triers of fact that the plaintiffs' gas tanker unit was on the wrong side of the highway as it crossed the bridge. As we have seen, the plaintiffs' driver of the unit testified not only that no tracks could be seen on the bridge on account of there being ice and no snow on the highway over it, but that his unit was on its right side of the roadway in crossing the bridge.

There was other conflicting evidence on the location of these units when the collision occurred but sufficient has been recited to indicate that it was the duty of the jury to resolve these contradictions and under the rules of law mentioned above we are necessarily bound in this Court by its conclusions.

On the charge of negligence by each party as against the other, also, that their respective units were equipped with defective and insufficient brakes, the testimony given appears, briefly stated, to be as follows:

Plaintiffs' driver, Washburn, testified that the roadway was icy before he arrived at the bridge and that he used his air brakes to hold his unit so it "would not go so fast," i.e., that his brakes were operative in holding the gas tanker from going too fast; that this witness asked Ballard, the driver of defendant's Butane tanker "why he tried to take the bridge from the loaded truck and he said his brakes would not hold"; that before this collision this witness had been driving the gas tanker practically all the time; that its equipment was in "A-1 shape". Plaintiffs' witness Carruthers testifying in his own behalf said that their unit was "new in October." Defendant's witness Ballard, the driver of defendant's unit stated that when Washburn asked him (Ballard) why he didn't stop, that Ballard told him "because of the ice, my brakes, they wouldn't work. I said I applied them once and they slid and I didn't use them any more." Ballard also said that the Butane tanker he was driving "was not very old; it had 6400 miles on it, something like that; it was less than 7000 miles"; that it was in very good mechanical condition with reference to lights and brakes; that it had been last inspected the trip before this one; that he had not had any trouble with the brakes on that trip.

It was the peculiar province of the jury to determine from this evidence whether either of the parties was using defective and insufficient brakes at the time of the accident and whether such fact, if so, was a proximate cause of the accident.

Relative to the counter charge made by the parties, each against the other, that the driver of each respective unit was driving at such a fast rate of speed that he did not have proper control over his unit, the evidence on this point may be shortly stated thus:

Washburn's testimony was that he was driving between fifteen and twenty miles per hour; that Ballard was "coming right along. Yes, he was quite a bit faster driver than I was"; that after holding his (Washburn's) unit with the air brakes he let the air loose so that the unit would roll onto the bridge; that he was going at that time about fifteen or twenty miles per hour. On cross examination Washburn testified that he was ten yards north of the bridge when he cut the air off and let the unit roll and he was then doing ten to twenty miles per hour; that the unit did not exceed twenty miles per hour before reaching the bridge; that Ballard did not, to Washburn's knowledge, reduce the speed of the former's unit until after the collision; that Ballard did not reduce his speed as he came down the hill south of the bridge.

However, Ballard as defendant's witness on this matter of speed stated: That the terrain to the south of where the accident happened was "up and down hills and deep ravines" about four or five of them in a row; that he did not see the gas tanker until he got to the top of the hill before the bridge; that the top of this hill was not over two hundred yards from the bridge; that the road dropped from the top of this hill sixty, seventy or eighty feet to the bridge; that the grade of the road on the north side of the bridge is not nearly

as steep; that at the time Ballard approached the bridge the "highway was ice"—with a light coat of snow over it, the air clear and it was not storming; that this icy condition existed for about two or three miles south of the bridge; that as Ballard approached the bridge he pulled off to the right side of the road and started to slow down but with the snow on the highway, the tires wouldn't take hold, "there was no use trying"; that Ballard did not know there was a bridge there as there was no bridge sign and this was his first trip over this road when he did all the driving; that witness does not think the driver of the gas tanker changed his speed which was very near the speed of the Butane tanker; that the speed of the unit last mentioned as Ballard drove it down that hill towards that bridge was thirty to thirty-five miles per hour which was the speed he had been traveling some distance back down the road.

On cross examination the same witness testified on this matter of speed on the part of his unit: That he applied the brakes once on this steep part of the hill; that anybody that drove a truck much don't use them (the brakes) any more, especially on ice; that he did not turn off his lights, just dimmed them; that this snow on this ice piled up in front of his tires on the ice making it like a sled then; that he ran against compression which don't do much good coming down hill; that coming down hill on compression a truck won't gain much in speed but it won't slow it down much; that witness pulled the Butane unit over to the right to give the driver of the gas unit a little more time to come through the bridge if he was going to.

The record then shows that the following questions were asked and this witness answered:

"Q.   You couldn't stop.

"A.   No.

"Q. You were travelling about 30 to 35 miles per hour?

"A. Yes.

"Q. Did you tell the sheriff it was 40 to 45?

"A. It might have been 40.

"Q. Didn't you tell the sheriff it was 40 to 45?

"A. It wasn't over 40.

"Q. It wasn't over 40?

"A. No."

It was stipulated by counsel for the respective parties that the sheriff of Platte County who investigated the accident shortly after it happened would, if present at the trial testify that:

"Washburn said he was driving 10 to 15. Ballard said he was driving 35 to 40. Weather conditions marked clear. Slippery, wet, paved road."

It is very evident that this conflicting proof on the matter of the speed of these two units was properly to be resolved by the jury under the Instruction No. 7 quoted above as to whether either of these units was driven on the highway at a "speed greater than is reasonable and prudent under the conditions then existing." There was no error in declining to direct a verdict for the defendant.

Relative to the charge of negligence against the driver of the Butane tanker in that he violated a prevalent custom known to and observed by drivers of trucks hauling liquid fuels on Highway 87, we can very well consider that point in connection with our conclusions touching Instruction No. 10 given by the court to the jury, excepted to by the defendant and reading as follows:

"YOU ARE INSTRUCTED that plaintiffs claim there was a custom as to the driving of transports hauling gasoline or other similar fuels upon Highway No. 87,

where the accident occurred, and that such custom was that the driver of an empty transport would give the right of way to the driver of a loaded transport at a bridge where passage of two transports, approaching in opposite directions, might be dangerous, and you may take such custom into consideration in arriving at your verdict, provided you find that the evidence discloses its existence, and also discloses that defendant's driver knew of such custom or that same was so prevalent that, in the exercise of ordinary care, he should have known of the same."

We think that it would have been better if this instruction had not been given. In the first place, as said by the Supreme Court of Iowa in Langner vs. Caviness 238 Ia. 774, 28 N. W. 2d 421:

"It is generally held, however, that a custom which conflicts with a statutory provision will not be enforced. Where there is such conflict, the statute must control. 55 Am. Jur. 279, 280, section 17; 25 C. J. S., Customs and Usages, § 10b, page 91; Harris v. Rutledge, 19 Iowa 388, 87 Am. Dec. 441; Milroy v. Chicago, M. & St. P. Ry. Co., 98 Iowa 188, 197, 67 N. W. 276. Accordingly it is usually held that a custom contrary to statute or ordinance may not be shown to excuse a violation thereof. 1 Blashfield Cyclopedia of Automobile Law and Practice, Perm. Ed., §651, page 460; Huddy Cyc. Autom. Law, 9th Ed., Vol. 15-16, page 373, section 201."

\* \* \* \*

"Plaintiff asserts the pleaded custom may not be shown for any purpose because, it is said, it conflicts with section 321.298, Code 1946, 5024.02, Code 1939, which requires persons in vehicles meeting each other on the public highway to give half the traveled way by turning to the right."

\* \* \* \*

"We think the custom pleaded here cannot be invoked to supersede or nullify the above statute."

Our examination of the record fails to disclose that either the driver of the gas tanker or the driver of the

Butane tanker knew at the time they each approached the bridge in question, whether either equipment was loaded or empty. In fact, as referred to above, Washburn testified (on recall) in answer to the question:

"Q. You couldn't tell from your observation of the truck approaching, whether it was empty or not?"

"No." As already noted, it was still dark when these two units approached the bridge and even if it had been light it is not easy to perceive how Washburn's answer could have been different, the liquid fuels carried being confined, of course, in steel tanks located on the respective trailers. This fact was perfectly obvious to the jury. That body could not have been misled or confused by this instruction.

In the Langner case supra, the trucks passed each other in day light and one was loaded with rock. In the case of Marich vs. Moe, 4 Wash. 2d 343, 103 Pac. 2d 362 cited by defendant, the colliding vehicles were both logging trucks and there was testimony that both loaded and unloaded trucks passed without difficulty at the collision point. The Appellate Court held under such a situation that evidence of a custom of empty trucks giving the right of way to a loaded truck was immaterial. In the case at bar the undisputed evidence was, to which reference has already been made, that the bridge width available for travel was two hundred twenty-five inches. The width of each, the Butane truck and the gas tanker, did not exceed eight feet or ninety-six inches or a total for both of one hundred ninety-two inches, leaving thirty-three inches leeway. If each unit had kept eleven inches from each shoulder or lip of the bridge there would have been eleven inches of clearance space between the two vehicles and they would have passed safely.

Evidence of the alleged custom was, under the circumstances shown by the record, quite immaterial.

However, both parties without objection submitted evidence in regard to the matter. The error if error there was, was harmless. 5 C. J. S. 956 Section 1724; ibid. 1018, Section 1735.

We conclude, therefore, that even if the giving of Instruction No. 10 was error it was not so prejudicial as to require a reversal of the judgment herein. It simply threw an extra burden on plaintiffs which they did not sustain, i.e., that of establishing that each driver knew the status of the opposing vehicle, whether one or both was loaded, as they approached the bridge.

In Aronovitch vs. Ayres, 169 Va. 308, 193 S. E. 524 the Court remarked:

"Objection is made to plaintiff's instruction No. 1. That instruction sets out statutory rules governing the operation of motor vehicles on public highways. Much of it is inapt and deals with situations which never obtained in the instant case, and so should not have been given; but we do not think the jury could have been misled. For example, it was told that the offending truck should have moved on the right-hand side of the road. Of course, that rule has no application when there is an attempt to pass the car ahead. Again it is told that when such an attempt is made proper lookout must be kept for approaching vehicles. There were no approaching vehicles. Manifestly it is unnecessary to tell the jury what the defendant's obligations were in nonexistent circumstances. This work of supererogation might at times constitute reversible error. We hold that it does not amount to that in the instant case."

In Stammerjohan vs. Sims — S.D. —, 31 N.W. 2d 449 the court said:

"If an instruction is requested which is not relevant to an issue in the case, it should be refused though it may state a correct principle of law. Defendant admittedly had the right of way and there was no evidence upon which the court could base defendant's requested instruction. We think too that the instruction given by the court was not prejudicial. The giving of

an inapt instruction is not ground for reversal, where it is manifest from the undisputed facts that it could not have prejudiced the party appealing."

See also 4 C. J. 1037, Section 3017, Note 76 and cases cited; 5 C. J. S. 1132, Section 1764, Note 89 and cases cited; and Roberts vs. White 266 Ky. 483, 99 S. W. 2d 447.

In Rentz vs. Collins, 51 Ga. App. 782, 181 S. E. 678 the court said this:

"Although there may not be any evidence to authorize the inference that the defendant's automobile, in which the plaintiff was traveling and which collided with another automobile, was not equipped with efficient and serviceable brakes, as alleged in the petition, yet where it appears from all the evidence, including the uncontradicted evidence, that the defendant's automobile was at the time equipped with efficient and serviceable brakes, and where the evidence was also sufficient to authorize that inference that the defendant was negligent in the operation of the automobile in other respects as alleged in the petition, such as at an unlawful and negligent speed, and that such negligence was the proximate cause of the plaintiff's injury, it appears that it was not harmful to the defendant for the court to charge that it was unlawful for motor vehicles to be operated upon the streets or highways of this state unless they were equipped with efficient and serviceable brakes, and that it was the contention of the plaintiff that the defendant was operating a vehicle which had defective brakes."

There was substantial evidence as we view this record which if believed by the jury, enabled it properly to find that the driver of defendant's vehicle was negligent in not keeping it on its own side of the highway and also that the driver of that vehicle was negligent in driving his vehicle upon the bridge at a speed greater than was "reasonable and prudent under the conditions then existing"—a wet, icy, and slippery surface—and that these acts of negligence proximately caused the accident.

Complaint is made that the court erred in declining to give Instruction No. A which reads:

"You are instructed that the laws of the State of Wyoming provide:

"(1) No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent under the conditions then existing.

"(2) Whenever any person traveling with any vehicle or conveyance on any road or public highway in the State, shall meet another vehicle or conveyance traveling in the opposite direction, it shall be the duty of the driver of such vehicle or conveyance to turn promptly to the right of the center of the traveled road and to remain on the right of the center of the traveled road until such vehicle or conveyance has passed.

"(3) Whenever the driver of a vehicle approaching an oncoming vehicle within five hundred feet, such driver shall use a dim or lowered distribution of the headlights on his vehicle."

Instruction No. 7, given by the Court and hereinabove quoted entire, in its first and second paragraphs covered the same points as like paragraphs in No. A do. There was no charge of negligence against either plaintiffs or the defendant grounded upon failure of the drivers of these two units to dim their lights. That fact we think a sufficient answer to defendant's contention on this point. It may be noted also that Instruction No. 7 likewise told the jury, and properly so, that it could not find a verdict against the defendant on account of violation of statutory requirements enumerated unless it was convinced "by a fair preponderance of the evidence that the violation of the statute was the proximate cause of the collision." This qualification should have been added to Instruction No. A if it had been otherwise proper—which it was not. There was no error in refusing to give Instruction No. A.

Upon the entire record and the claims of error thereon made by the defendant, we are convinced that under the rules of law mentioned above and the authorities cited herein the judgment under review was not contrary either to the evidence submitted or the law applicable, is sustained by substantial evidence and should be affirmed.

*Affirmed.*

KIMBALL, J. and BLUME, J. concur.