## NORTHWEST STATES UTILITIES COMPANY v. BROUILETTE

(No. 1960; February 23, 1937; 65 Pac. (2d) 223)

(Petition for Rehearing denied July 6, 1937)

134

For the plaintiff in error, there was a brief by *C. A. Kutcher* of Sheridan, Wyoming.

For the defendant in error, there was a brief by *R. E. McNally* and *John G. Hutton* of Sheridan, and *E. E. Enterline* and *Madge Enterline* of Casper, and oral arguments by *Messrs. Enterline* and *McNally*.

*C. A. Kutcher* in reply.

TIDBALL, District Judge.

On February 11, 1933, an explosion took place in the basement of a building in Sheridan occupied by the City Furniture & Paint Company store. The furniture company was not the owner but the lessee of the building. The explosion was tremendous, resulting in breaking glass, dislodging plaster, and cracking the building in question. At the time, plaintiff Brouilette and W. L. Ashton, plaintiff in a companion case, were in the basement and were injured by the explosion. The building was a two-and-one-half story brick structure, about

fifty by one hundred feet in size, facing westerly on Main Street in Sheridan. In the upper northeast story of this building was an apartment occupied by W. L. Ashton and his wife. Plaintiff Brouilette resided elsewhere in Sheridan. The ground floor was occupied as the main store of the furniture company. The basement was full size and extended beyond the superstructure along the east end, and was used partly as a storage room and partly as a work shop in connection with the business, and also contained a furnace room with a steam boiler fired with coal which heated the building by means of steam radiators. In the furnace room was a gas water heater operated by hand—that is to say, it had no pilot light and it was lighted by the operator when hot water was needed, and turned off by hand at the conclusion of the operation. The gas heater was vented by a flue into the chimney and, according to the testimony of a witness for the defendant, no gas would escape therefrom even if the gas were turned on and not lighted. To supply the Ashton apartment in the upper story, a gas range and gas heater were installed therein by Mr. Ashton, and afterwards connected to the gas service line by the defendant gas company. In the basement of the building were several rooms, in addition to the furnace room, one known as the paint room, where paint was stored, and which at the time of the explosion in question contained the gas meter, regulator and a portion of the gas feed pipe by which gas was conducted to the building from the gas main, through the regulator and meter and on through the gas service pipes to the different parts of the building. The use of gas in the building was begun in September, 1932, at which time the service pipes from the gas meter to the water heater in the furnace room and to the Ashton apartment were already in the building. To whom they belonged is not shown by the evidence, but presumably they went with the building, which, as

stated, was owned by a third person from whom the furniture company leased it. In September, 1932, Ashton, who was then secretary-treasurer of the furniture company and a stockholder therein, had the Northwest States Utilities Company, the gas company operating in Sheridan, and who was the defendant in the case below, and who will hereafter be referred to as the gas company or as the defendant, install gas in the building. This the gas company proceeded to do, using the service pipes already there, and connected up the gas with basement water heater and with the gas range and gas heater Ashton had in his apartment; and, after doing this work, informed Ashton, as he testified, that everything was ready for the use of gas, that it was in perfect condition, and the gas company turned on the gas. Ashton, according to his testimony, asked the gas company to thoroughly test all gas lines and apparatus and received the report that all was well. Shortly after the installation of gas in the Ashton apartment, Mr. Ashton and his wife became sick. There was a distinct natural gas odor in the apartment and in the basement from time to time after the gas was turned on; and until the explosion, when the furniture company quit using gas. At the time the Ashtons became sick, they suffered from headache, dizziness and nausea, symptoms of natural gas poisoning, according to the testimony of plaintiff's witnesses, though this is denied by defendant's witnesses. Ashton could taste the gas. When the Ashtons became sick, they notified the gas company and a man was sent to make an inspection. He reported to the Ashtons that he had checked the gas line and everything was all right. At the same time he reported to the gas company—"tested all joints for leaks. Lit flame on pilot lighter."

The plaintiff's evidence is to the effect, from several witnesses, that as soon as gas was turned on in September, 1932, and from then on until the time of the

explosion in February, 1933, from time to time, though not continuously, there was a distinct odor of natural gas in the building and especially in the basement thereof, and several of the employees suffered from a tickling sensation in the nose, smarting of the eyes, dizziness, headaches and nausea—symptoms of natural gas breathing, as they claimed. This condition continued until the morning of the explosion on February 11, 1933, after which time the use of gas was discontinued in the building, and after which no further odors appeared and no further symptoms of gas poisoning were felt. The gas odor was particularly strong thé day before the explosion, according to Agnes Fisher, one of plaintiff's witnesses.

From September, 1932, the gas installation date, to February 11, 1933, the explosion date, the gas company, according to the testimony of Ashton, which was not objected to, was notified on at least two occasions that gas was escaping in the basement, though this is denied by the gas company. It had no record of any complaints during that period, and all the employees of the company who would receive such complaints, if made, denied receiving them. The plaintiff's witnesses who testified to such complaints were indefinite as to the time except that they were made between the time the Ashtons were sick and the day of the explosion. These complaints, if made, were not responded to by the gas company, its witnesses admitting that fact but claiming no complaints were received. Mr. Ashton, on the contrary, testified that one of the calls after his gas sickness was responded to by the gas company by sending a man down to investigate.

On the morning of the explosion, the plaintiff Brouilette, who did not live in the building, and was an employee of the furniture company, was tending the furnace for Mr. Swank, the regular furnace man, who was out on a job for the furniture company. Brouilette

had been caring for the furnace for a week or ten days previous to the explosion. He arrived a little before eight o'clock that morning, went to the back of the store where an elevator was located, took the elevator from the main floor, where it was habitually kept during the night, to the basement, went to the furnace room, opened the door to that room, which was a steel door and which was kept closed at night, proceeded to the water heater, lighted it, opened the furnace door, stirred up the furnace fire, which had been banked the previous night, and lighted a cigarette. He was in the room twenty-five to thirty minutes, and while there the furnace was burning. He did not notice any odor of coal gas nor any other odor. In the meantime, Mr. Ashton came to the basement by a stairway, went to the toilet, came out and struck a match to light his pipe, and the explosion took place. Neither Ashton nor Brouilette smelled any furnace or natural gas that morning.

At the time of the explosion, Ashton was by the telephone box near the southeast corner of the basement proper. The vault, paint room and coal bin were along the east end of the basement and were east of the superstructure and were roofed by concrete slabs held up by steel beams. The vault room was in the southeast corner of the basement, the paint room was next, and the coal bin was in the northeast corner. Ashton was thrown by the explosion in a northwesterly direction about twenty feet. Brouilette at the time of the explosion was standing about midway north and south of the basement and about twenty-five to thirty feet from the east wall of the basement proper—that is, about twenty-five to thirty feet west of the west wall of the paint room and the door thereto. He was thrown by the explosion in a northeasterly direction about twenty feet, directly towards the door of the furnace room.

Ashton was severely burned, and both were bruised and suffered from shock.

Immediately following the explosion, certain employees of the gas company arrived on the scene, took charge, and began making tests and, according to some witnesses for the plaintiff, the meter was dismantled and new gaskets put in; three pieces of pipe between the meter and the gas water heater in the paint room were disconnected, the joints painted with white lead and then replaced, and the soap test was then applied to see if there were leaks, and no leaks were found, defendant's witnesses testified.

While the gas company employees were working in the basement, Fay Swank testified on the trial, he was arguing with Bob Snead, a gas company employee, as to why they didn't just shut the gas off from the building and leave things alone instead of "monkeying around" with the gas line, and when Snead began to explain, Mr. Browne, the superintendent of the gas company, who was present, stopped the conversation by putting his foot on Snead's foot. After the explosion, gas was taken out of the building, as above stated, and no further gas odor appeared, and no employees in the furniture store suffered from headaches, dizziness and nausea thereafter—the same happy condition that existed before the gas was installed. After the explosion, it was found that labels on paint cans in the paint room were scorched, as were certain papers in the vault room, indicating that the burning of gas during the explosion had extended into these two rooms.

Sometime in June, before the trials in these cases began, one Byron D. Boatright conducted experiments in the basement of the building to ascertain the air currents therein, with a view of determining where gas leaking from the pipes, meter or other gas fixtures in the basement would accumulate. He used a bee ma-

chine to generate smoke by burning hay or straw. The witness testified as an expert. He is professor of petroleum production at the head of the department of petroleum engineering at the Colorado School of Mines. He holds a degree of engineer of mines at that school, where he graduated in 1922, and since graduation for a time he worked as a roustabout for Mutual Oil Company in Wyoming on gas equipment, oil pipe lines, gas engines, etc.; then he fired boilers with gas and had experience with nitroglycerine as an explosive; he worked two years as a tool dresser in the Salt Creek Oil Field for the Midwest Oil Company. In 1925 he began work with the oil and gas leasing division of the United States Bureau of Mines as a junior engineer and continued there for nine months, when he was promoted to assistant engineer, where he continued until the summer of 1926, when he was placed in charge of all government operations in gas and oil for Colorado. In October, 1926, he went with the Marland Oil Company of Texas as petroleum engineer, with general supervision of gas utilization, transmission measurement and compression. He was so employed for two years. In November, 1928, he assumed his present position with the Colorado School of Mines, where his work involves teaching of various phases of oil and gas production work and all phases of gas work. He is familiar with the methods of natural gas distribution through pipes and has done a good deal of consulting work on various phases of gas and oil. He has on three occasions investigated natural gas explosions in Wyoming. He testified that he was familiar with the constituent parts of natural gas, its odorization by the use of "Calodor," the substance used at Sheridan, and had had experience around rooms, furnace rooms, cellars and gas wells where gas would accumulate. He testified that if a person is exposed for any length of time to gas fumes he loses his sensitiveness to smell, that the Sher-

idan gas was dry gas, and lighter than air, being about one-half as heavy. In mixtures of five per cent to fourteen per cent of gas with air, the mixture is explosive; but with less gas in the mixture it is not explosive, and with a heavier mixture it will burn but not explode; and that the explosion in question could have occurred from a very small leak.

He made experiments with his bee smoker under various conditions in the basement of the furniture store. During some experiments, the temperature was lower outside the basement than inside and vice versa. He experimented on five different occasions with windows and doors closed and with them open, at night and in daylight, and found that smoke released in the vault room by the gas meter under conditions approximating those that existed on the night preceding and morning of the explosion would accumulate where the explosion took place. Smoke released in the furnace room or outside, between that room and the elevator shaft, went into the furnace room and into the furnace, except a small part that went up the elevator shaft, showing the air currents there were towards and into the furnace room or up the elevator shaft. The testimony concerning his experiments was objected to by defendant on the ground that the conditions at the time of the explosion, when it was five or six degrees below zero the preceding night, were not the same as in June, when the experiments were made. In answer to questions by counsel and by the court, the witness testified in substance, as we understand it, that while the outside zero weather would accelerate the air currents so that they would be more noticeable than in June, it would not change the directions of the currents. In other words, the accumulation of gas from the paint room to the place of explosion would be greater in extremely cold weather than during the more mild weather of June. He found by his experiments that

when it was colder outside at night-time than inside, the air currents were more marked and hence concluded that the only effect of the sub-zero weather in February, at the time of the explosion, would be to accelerate still further the air currents, but their direction would not be changed thereby. His testimony was then allowed by the court over defendant's objection. This witness further gave it as his opinion that under the facts as shown in the case by plaintiff's testimony, and as outlined above, the explosion was a natural gas explosion, that the gas which exploded came from the paint room, and that coal gas from the furnace would not travel to the point of the explosion.

The defense asks us to disregard entirely the testimony of the witness Boatright and to hold that it should have been excluded by the trial court from consideration of the jury, because of the difference in temperature at the time of the experiments and that of the explosion. Defendant's experts in their testimony claimed the experiments by Boatright were valueless because of this difference. Counsel in his oral argument before this court asks us to take judicial notice of the utter valuelessness of this testimony, but we doubt if we should take judicial knowledge of something about which the experts disagree and concerning which we know so little. We doubtless could take judicial knowledge that cold air is heavy and tends to fall to the ground, and warmer air is thereby pushed away in an upward direction, and that this movement would create an air current; but we think it was a question for the jury to determine from all the evidence whether the witness Boatright was correct in his testimony that the air currents would have moved in the same direction in February, 1933, as in June, 1935.

The testimony as outlined above is from the standpoint of the plaintiff, and little is said concerning the defendant's testimony, and this for the reason that we

are asked to hold as a matter of law that the plaintiff's evidence was not sufficient to go to the jury and the trial court should have instructed the jury to return a verdict for defendants. This question was amply raised in the trial by defendants, first, by a motion at the close of plaintiff's case for an instructed verdict; second, by the same motion at the close of all the evidence; again, by a request for the giving of such an instruction; then, by a motion for judgment notwithstanding the verdict; and, lastly, by the motion for new trial.

When a request is made to the court to wrest a case from the decision of the jury and direct the verdict or to enter judgment in opposition to the verdict, the principles of law upon which the decision of the court must be based are clear. In the first place, the credibility of the witnesses and the weight of their testimony are for the jury alone to determine. C. B. & Q. R. Co. v. Pollock, 16 Wyo. 321, 93 Pac. 847. Again, a motion for judgment at the close of plaintiff's case is in the nature of a demurrer to plaintiff's evidence, and admits its truth for the purpose of the motion. Boyle v. Mountford, 39 Wyo. 141, 270 Pac. 537. Further, where there is a substantial conflict in the evidence, it is improper for the court to direct a verdict. Weaver v. Richardson, 21 Wyo. 158, 129 Pac. 828. In 64 C. J., 432-433, the rule is stated in this language:

"By moving for a directed verdict, the maker of the motion admits the truth of whatever competent evidence the opposing party has introduced, . . . not only of all that the testimony proves, but of every material or ultimate fact which it tends to prove, . . . together with all fair and reasonable inferences or conclusions of fact favorable to the adverse party, fairly or reasonably inferable or deducible therefrom by a jury."

In case of Willis v. Willis, 48 Wyo. 403, 429, 49 P. (2d) 670, it is said:

"In this connection (where it is claimed the judg-

ment is not sustained by sufficient evidence) it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it."

At the close of the case the trial court directed a verdict for the defendant Edward W. Browne, but let the case go to the jury as to the gas company, the Northwest States Utilities Company, resulting in a verdict for the plaintiff for $3,500.

The defendant vigorously contends, first, that there was no evidence that the explosion was from natural gas; second, even if this court should not sustain that contention, there was no evidence of negligence on the part of the gas company, and, in this connection, that the evidence by plaintiff concerning the several complaints to the gas company of the leakage of gas in the basement was not under the pleadings within the issues of the case; that the court erred in its rulings on admission of evidence, particularly in allowing Boatright's testimony as to his experiments with the bee smoker, and in allowing plaintiff's experts to testify as to the permanent nature of plaintiff's injury, based in part upon what plaintiff told the witnesses as to his symptoms; that the trial court committed further error in refusing to submit certain interrogatories to the jury requested by defendant; and in refusing to give certain instructions requested by defendant; and in the giving of certain instructions objected to by defendant.

We think none of these objections will require a reversal, and shall attempt as briefly as possible to state our reasons for that conclusion.

The plaintiff's petition regarding the matter of negligence alleged that defendants "negligently and care-

lessly permitted said gas lines and equipment to be and remain out of repair and to become defective, unsafe, and dangerous, and carelessly neglected and failed to adequately odorize the gas contained in and passing through said gas lines and equipment in an odorless or inadequate odorized condition," and then alleges that by reason of such negligence "natural gas was negligently and carelessly permitted by said defendants to leak therefrom and escape into the said basement and accumulate therein in such quantities as to become dangerous," etc. This allegation was denied in the answer.

Counsel for defendant states in his brief the rules of law be believes applicable to the liability of a gas company for leaks in the pipes and equipment through which gas is conveyed and used, and we will assume for the purposes of this case that the statement is correct. He says: "A gas company must use reasonable care to maintain and keep in repair its pipes and equipment—those owned and controlled by it. But as respects the pipes and appliances belonging to and under the control of the owner or occupant of a building, which the company has not installed, or not defectively installed, no duty rests on the company of inspection, maintenance or repair, and it is liable for a leak and explosion of gas therefrom only after reasonable notice of such leak, and failure thereafter to use reasonable diligence to stop the leak or shut off the gas."

Was the evidence sufficient to allow the jury to find that the explosion came from natural gas, as the jury found in answer to an interrogatory submitted to them by the court? We think so. There was a gas explosion. Defendant does not suggest that it could have been produced from some other gas than natural gas or furnace gas. As to furnace gas, there was never any smelled during the six years the building was occupied by the furniture company; there was never any trouble of any kind with the furnace; its draft was good. Aside

from the fact that there was a furnace in the building and that an explosion occurred which, from its nature, could have been a coal gas explosion, there is no evidence indicating it was such except the evidence of William Price, a witness for the defendant, who testified that he was a janitor in the building in 1919 and that there was a coal gas explosion in February of that year in the furnace room when he went down and opened the furnace room door. He was at that time accompanied by a Mr. Stone, but the latter did not testify. The explosion threw Mr. Stone back in the elevator but Mr. Price was not thrown back because he had hold of the door. They then had a little drink and Price knocked the prism lights out of the covering to the manhole in the coal room, and after that there was never any further trouble with coal gas. Whether these prism lights were out at the time of the gas explosion fourteen years later is not shown. On the other hand, there is the evidence of many witnesses that natural gas was constantly smelled in the basement, that coal gas was never smelled, and, in addition, the testimony of Boatright as to his experiments and conclusions. So, we think the jury not only had a right to find it was natural gas explosion, but the weight of the evidence was to that effect.

Was the gas company negligent? At the outset of a discussion of this question, it is necessary to say something about the pleading and the proof, because, as stated heretofore, defendant contends that evidence of notification to the gas company of the leakage of gas in the basement, as testified by plaintiff's witnesses, was not admissible, and that such evidence proves a cause of action different from the one alleged. This evidence was not objected to when offered, but the question was later raised on motion for a directed verdict. The precise claim is, as we understand it, that the petition alleged that the gas company negligently and carelessly

allowed the gas line and equipment to be and remain out of repair, and to become defective, unsafe and dangerous, while the proof was that gas was leaking into the basement from somewhere and that the gas company, though notified of such leakage, negligently failed to repair the leak; and that, even if there was a leakage of gas, there is no way to determine whether it came from that part of the line and equipment owned by the gas company or that part not so owned, and that as to the latter the gas company would be liable for a leakage only in case it was notified thereof and failed to repair the leak or shut off the gas within a reasonable time. Hence, it is argued, without an allegation in the petition that the negligence consisted of a failure to repair the line or shut off the gas upon reasonable notification of the leak, evidence of such failure tended to prove a cause of action for negligence not pleaded, and failed to prove the negligent act pleaded.

Our statute (Section 89-1042, W. R. S. 1931) requires that pleadings be liberally construed. We think the upholding of defendant's contention as to a failure of proof would constitute a strict and narrow construction of plaintiff's petition. In addition, the rule of law seems to be that an allegation in a pleading that defendant *negligently* permitted a defective or dangerous condition to exist at the place of the injury is a sufficient allegation of notice, without a specific charge to that effect, especially after verdict, or in the absence of a motion to make more specific. See 45 C. J., 1068, and cases cited in notes, which seem to sustain the text. As heretofore stated, this evidence of notice to the gas company went in without objection. There was no claim of surprise. Plaintiff's evidence was fully met by defendant, so that the question as to notice to the gas company was litigated on the trial. The petition, having alleged that defendant *negligently* allowed the gas line and equipment to become out of repair, would seem

to imply by the use of the word "negligently" that the failure to repair was after notice of the necessity for repair, because under the rule of law contended for by defendant, and which we are adopting for the purposes of this case, defendant could be charged with negligence for failure to repair that part of the line and equipment not owned or controlled by the gas company, only after receiving notice of a leak. An allegation of negligence due to failure to repair under such circumstances imports by the use of the terms themselves that the failure was after notice. See 45 C. J., supra, and cases cited in notes.

The defendant also contends that even if the evidence of notice of leakage was admissible and tended to prove the negligence alleged, nevertheless the evidence was too indefinite because the witnesses could not fix the time when the several notifications were made. But we think it pretty clearly appears, if the evidence of plaintiff is to be believed—a question for the jury—that on at least two occasions between the time the Ashtons became ill and the date of the explosion, the gas company was notified that the basement was full of gas and failed to respond to any effect. There is no contention on the part of the gas company that there was not a reasonable time allowed to repair the leakage before the explosion, because the gas company admits it entirely failed to respond to such notification, contending in this connection that no such notice was ever given. Under these conditions, we think there was sufficient evidence from which the jury might find negligence on the gas company's part in failing to repair the line and equipment after being notified of a leak and that the evidence touching these matters was within the issue, and this was the issue submitted to the jury by the court's instruction, as will hereafter appear.

The defendant makes some contention that it is just

as likely that the gas causing the explosion, if natural gas, came from the water heater in the furnace room. This is partly answered by Boatright's experiments showing the air currents were into and not out of the furnace room, but particularly by the defendant's witness Cogwin, who testified under examination by defendant's counsel that even if gas were turned on in the heater and not lighted it would go up the chimney and not into the basement. The jury had a right to believe this testimony.

When the case was submitted to the jury, defendant requested that, in addition to the general verdict, the court require the jury to answer seven special interrogatories prepared by defendant's counsel. This the court refused to do, but submitted three interrogatories, on its own behalf or as substitutes for those requested by defendant. The defendant excepted to the refusal of the court to submit the seven interrogatories requested by defendant, and further excepted to submission of Interrogatories 2 and 3 given by the court. Interrogatory No. 1 submitted appears to be the same as No. 1 requested. By it, the jury was requested to state whether the substance that exploded was natural gas of the defendant gas company. The jury said it was. By Interrogatory No. 2 submitted, the jury was requested to say whether, if answering "yes" to Interrogatory No. 1, the gas that exploded escaped into the basement from a leak "in the gas service line, or house line, or meter, or regulator in the basement, or any of them." The answer was "yes." No. 3 requested the jury to say, if "yes" was the answer to Nos. 1 and 2, whether the leak was the result of want of repair on the part of the gas company of the gas line or equipment. The jury said "yes" again. The jury, then, by their answers to the interrogatories propounded by the court found the substance that exploded was defendant's natural gas, that it escaped from a leak in the gas

line or equipment in the basement, and that it escaped because of want of repair by the defendant. It would appear then that the jury resolved all the principal issues, with one exception not submitted by interrogatories, in favor of the plaintiff. The exception was the question as to whether the gas company was notified of the leakage so that its failure to repair constituted negligence. This question might very well have been submitted by an interrogatory, but the defendant did not ask it. Instead, defendant asked the court to submit to the jury interrogatories as to the particular point in the line or equipment that the leak occurred, and the nature of the defect at that point—questions that obviously the jury could not answer, because the evidence failed in that particular, due, according to plaintiff's contention, to the action of the defendant immediately following the explosion in taking charge of the investigation, removing the old gaskets from the meter and replacing them by new ones, and covering the pipe joints with white lead. In addition to the interrogatories already mentioned, defendant requested others directing the jury to say if defendant was negligent, of what the negligence consisted, and how long the leak had existed before the explosion. The matter of negligence was covered by the instructions, and the jury in answer to the third interrogatory submitted found that the leak was caused by want of repair on the part of the gas company; while plaintiff's evidence, which the jury evidently accepted, was to the effect that gas had always leaked from the day of its installation.

The submission of interrogatories is not a matter of right but of discretion on the part of the trial court. Opitz v. Town of Newcastle, 35 Wyo. 358, 249 Pac. 799. We cannot say the court abused its discretion in this case. In the Opitz case (supra), the trial court refused to submit any interrogatories, and it was held no abuse of discretion.

We shall next consider the alleged errors concerning the trial court's rulings on the matter of instructing the jury. Defendant sets out in its brief two refused instructions, Nos. C and D, and contends the court erred in refusing to give them. Defendant also complains of the giving of Instructions 1, 2 and 8. Instructions C and D requested and refused are as follows:

"Instruction No. C. You are instructed that the mere fact the defendant may have been notified that gas was escaping in the building in question prior to the explosion, if you find it was so notified, is not sufficient of itself to establish any responsibility on the part of the defendant for the explosion, unless and until the plaintiff has proved in addition to such notice, by a preponderance of the evidence, the actual existence of a leak of gas in the meter, regulator, or service pipes, or their connections, which caused the explosion. And if, from all the evidence, you believe no such leak existed, then the defendants would not be liable, notwithstanding such notice. It will be apparent to you that notice of a leak of gas would create no responsibility unless a leak of gas actually existed.

"Instruction No. D. You are instructed that the plaintiff has charged, and must prove, by a preponderance of the evidence, that the substance which exploded and injured him on the 11th day of February, 1933, was the natural gas of this defendant company, and if you believe from the evidence that he has failed to so prove that charge, or if from all the evidence, you believe it just as reasonably probable that some other gas produced the explosion as the natural gas of defendant, then you are not permitted to guess or conjecture, but should return a verdict for defendant."

Instructions 1, 2 and 8, given, read as follows:

"Instruction No. 1. This is an action brought by plaintiff, Weldon Brouilette, against the defendant, The Northwest States Utilities Company and Edward W. Browne to recover damages for personal injuries which he alleges he sustained by reason of an explosion of natural gas in a building in Sheridan, Wyoming, known as the City Furniture Company building.

"He alleges in his petition that on February 11th, 1933, and for a long time prior thereto, the defendant Company owned, operated and maintained pipelines in the streets and alleys in the City of Sheridan, Wyoming, for the purpose of conveying, transporting, furnishing and distributing natural gas through said pipe lines to the inhabitants of the city of Sheridan, and that during all of said time it owned, operated and maintained a service pipe line from one of its main pipe lines in the City of Sheridan into the basement of the City Furniture building; that one of these interior service pipe lines ran into the furnace room in the basement for heating and another up the elevator shaft to the upper stories for use of the occupants of said building; that the gas transported through all these lines was owned and exclusively controlled by the defendant Company while the pipe lines themselves and the equipment used in connection therewith were under the exclusive control and management of the Company.

"The plaintiff further alleges that on February 11th, 1933, and prior thereto the defendant had negligently permitted its said gas lines and equipment to become and remain out of repair and to become defective and unsafe and failed to odorize adequately the gas passing through its lines and equipment, and that by reason thereof gas leaked from its lines and escaped into the basement of said building where it accumulated and on February 11th, 1935, exploded causing injuries to the person herein complained of.

"The defendant Gas Company for its answer, admits that the defendant company owned, operated and maintained pipe lines in the streets and alleys of the City of Sheridan, Wyoming, for the purpose of conveying, transporting, furnishing and distributing natural gas through said lines to the inhabitants of the city of Sheridan; admits that on February 11, 1933, and prior thereto gas was transported and distributed through pipes to the occupants of said building for heating and domestic purposes; admits that on February 11, 1933, an explosion occurred in the basement of said building from which the plaintiff received some injury. All other allegations of the plaintiff's petition the defendant denies.

"The evidence in the case is insufficient to warrant

a verdict against Browne and your verdict will be in his favor."

"Instruction No. 2. You will observe the specific negligence charged against the defendant company in the plaintiff's petition is that it permitted its gas lines and equipment, and the house line within the building, to get out of repair and to remain in such condition and to become so defective that natural gas leaked therefrom and, accumulating in the basement of said building ignited and exploded."

"Instruction No. 8. To prove to you the negligence charged the plaintiff must show by a preponderance of the evidence the following things:

"First: That the gas which exploded was natural gas and came from some leak in the regulator, meter or pipe line running from the alley to the regulator, or from some leak in the house line.

"Second: That the defendant company was notified prior to the explosion of the escape of gas into such basement.

"Third: That the defendant company had sufficient time after such notice and before the explosion in which to inspect such lines and equipment for leaks and that such leaks were discoverable by the usual and customary methods employed for such purpose and that it failed to stop such leaks, or, if the leak came from the house line, that it failed to turn off the gas.

"Fourth: That the escape, if any, of the exploding gas was the proximate cause of the injury to the plaintiff.

"By proximate cause as here used is meant that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred.

"If the plaintiff has proven these four things by a preponderance of the evidence, you should find in his favor. On the other hand, if he has failed in any one of them, you should find for the defendant.

"If, however, you find the gas causing the explosion escaped through the burner of the heater or range in the plaintiff's apartment, or through the valve and burner of the water heater in the basement, on account

of such valves being insufficiently closed by the parties operating such appliances, or from the furnace in the basement, the plaintiff cannot recover for the reason that as to them the defendant had no management or control."

It will thus be seen that Instruction C embodies the proposition that to have notified the gas company there was a leak of gas would not fix any liability on the company unless there was in fact a leak. The evidence of the plaintiff showed there was a leak. That was the reason for notifying the company. Instruction No. 8 given seems to cover this proposition fully, and it is a well recognized rule of law that no reversible error is committed by a court's refusal to give an instruction even where it is legally correct and applicable to the issues in the case, where other instructions given embody substantially the same propositions as requested in the refused instruction. Henderson v. Coleman, 19 Wyo. 183, 115 Pac. 439, 1136. The matter embodied in refused instruction No. D is likewise embodied in substance in Instruction No. 8 given. So there was no error in refusing Instructions C and D.

Instructions 1, 2 and 8 define the issues and correctly instruct the jury on the law, as we have attempted heretofore in this opinion to determine the issues involved in the case and the law applicable thereto, and we find no error in the giving of the instructions complained of.

In Instruction No. 1, the court explained to the jury the nature of the pleadings and the allegations respectively of the petition and answer. In so doing, the court, in telling the jury of the allegations as to defendant's negligence contained in the petition, mentioned the fact that the plaintiff accused the defendant of failing to adequately odorize the gas. The defendant claims this was error, because, first, there is no evidence that a failure to properly odorize the gas was a

contributing cause of the injury, and, second, the evidence shows that the gas was properly odorized. In the first place, we doubt that the rather incidental mention of the alleged failure to odorize the gas would mislead the jury. In Instruction No. 8, the instruction in which the court particularized the issues in the case, nothing is said of the failure to odorize the gas. It was only in connection with a statement to the jury of the respective claims set forth in the pleadings that the matter of odorization is mentioned. The petition did allege the failure to properly odorize the gas as one of the elements of negligence, so the instruction spoke the truth in telling the jury what the allegations of the petition were. In addition, we are not sure that the matter of failure to properly odorize the gas was entirely out of the case, for while the manager of the gas company testified he knew the gas was always properly odorized because he had instructed those who were handling the gas in the field to always add odorent and he smelled it many times to see if it was odorized and always found it so, still on the morning of the explosion and on many other occasions those working in the furniture store failed to smell gas. Both Ashton and Brouilette said they detected no gas odor the morning of the explosion. The jury may have doubted that the gas was at all times sufficiently odorized. At any rate, we do not think the mention of that allegation contained in the petition by the court in the connection in which it was mentioned could have misled the jury.

Another point raised by the defendant and on which its counsel contends this case should be reversed is the proposition of the admission of evidence by the court concerning the permanence and gravity of plaintiff's injury. During the trial of the case, and over defendant's objections, certain expert witnesses, being physicians, were allowed to give an opinion as to the extent and permanence of plaintiff's injuries, basing such

opinions partly on the subjective symptoms of the plaintiff, that is, on what the plaintiff told the physicians during an examination of him, which examination was made to enable the physicians to testify later on the trial as to plaintiff's condition.

The difficulty probably arose because of what is said in a quotation set forth in the case of Acme Company v. Westman, 20 Wyo. 143, 122 Pac. 89. The court there determined the law to be that a physician who treated a patient should be allowed to express an opinion in testifying as to the extent and duration of his injury, even though such opniion was based in part on what the patient told him. We have no occasion to disapprove that rule, as it accords with the great weight of authority. What is said in the quotation from an Indiana case about a physician who did not treat the patient but examined him solely to enable the physician to give an opinion as an expert is obiter dictum, because that point was not involved in the case before the court. Therefore, without overruling the Acme case, we may with propriety say that we do not approve the dictum contained in that case. We think the better and safer rule is that expressed in 22 C. J., 269-270. A physician who examines a plaintiff in a case, not for treatment but for the purpose of qualifying as an expert concerning the extent and permanence of plaintiff's injuries, should generally, though the necessity of the case may under peculiar circumstances require a departure from the general rule, be confined to giving his opinion based upon objective symptoms that he himself discovered by the examination or upon assumed facts contained in a proper hypothetical question or upon a combination of the two, and not upon what he was told by the injured person. The cases on this subject are collected in notes found in 65 A. L. R. 1217, 67 A. L. R. 10, and 80 A. L. R. 1527.

In the case at bar, three physicians, who did not treat

plaintiff, were allowed over objection by defendants not only to give opinions as to plaintiff's injury based in part on what plaintiff told them but even without relating what plaintiff said during the examination. In such a case, the physician is not only basing his opinion in part upon statements of the plaintiff that may be extremely self-serving but upon statements which are not disclosed to the jury, so that the jury has no way of determining whether such statements are shown by the evidence to have any substance in fact. When it becomes necessary and is competent for an expert to base an opinion partly on statements made to him by the plaintiff, the substance of such statements should be disclosed so the jury may judge whether they conform to the actual facts as shown by the evidence and the court should caution the jury to disregard an opinion based in part upon assumptions of non-existent facts. State v. Simonis, 39 Ore. 11, 65 Pac. 595. State v. Willson, (Ore.) 241 Pac. 843.

However, counsel for the defendant does not complain that the jury were not permitted to learn the nature of the statements on which the opinions were based, but because in some instances, the physicians were allowed to testify that statements were made to them and were permitted to give an opinion based partially on their examination and partially on what they learned from such statements. The question is, then, whether or not the improper testimony is reversible error, for the fact that the testimony was improper does not of itself show that we should reverse the case for that reason. Unless the defendant was prejudiced in view of the whole record, the case cannot be reversed on account of it. Counsel for plaintiff has failed to point out such prejudice. See Pardee v. Kuster, 15 Wyo. 368, 382, 89 Pac. 569. He has merely pointed out the error.

The fact that some damages were sustained by the

plaintiff was amply shown by the testimony for the plaintiff independent of that of physicians, and the testimony of the physicians went merely to the amount of such damages. Hence, though their testimony was erroneously admitted, we should in no event be justified in remanding the case except for the purpose only of re-assessing the damages. Dr. Carr testified that plaintiff's disability is sixty-five per cent. and he related the facts of the disability at length. While he treated the plaintiff, one or more of the examinations made by him were not made for the purpose of treatment but to enable him to testify, and his opinion as to the extent of the disability was based partially on the complaints of the plaintiff made at these latter times. But his testimony is not questioned either in the abstract of the record or in the briefs. It is not contradicted by any testimony for defendant and was ample to sustain the verdict returned by the jury. Dr. Steffen examined the plaintiff at the request of both the plaintiff and the defendant, and he stated that the plaintiff is disabled approximately fifty per cent. Dr. St. Antoine fixed the disability at from 50 to 100 per cent. and Dr. Soper at approximately 75 per cent. It will be noted, accordingly, that the testimony objected to of the three doctors last mentioned was largely cumulative and of a nature similar to that of Dr. Carr, to which counsel takes no exception in his brief, and when such is the situation, courts hesitate to reverse a case merely for the erroneous admission of such cumulative and similar testimony. 4 C. J. 974-975; Dec. Digest, App. & Error, Sections 1050-1052; Opitz v. Town of Newcastle, supra. Thus in 4 C. J. 975 it is said: "A rule which has been stated·and applied many times by reviewing courts is that admission of improper and objectionable evidence is harmless error where the fact involved is fully and clearly established by other evidence which is competent." In Peak v. Cottingham, 94 Ind. App. 365, 178

N. E. 309, the court used this language: "The admission of improper evidence of a fact in issue is harmless when the verdict or judgment is supported by sufficient competent evidence." In Home Ins. Co. v. Collins, (Tex. Civ. App.) 55 S. W. (2d) 898, the court, speaking of testimony objected to, stated: "However, if it be conceded that the court did err in this respect (admitting the testimony), the judgment should not be reversed for that reason, because the record is replete with evidence, admitted without objection, that justified the finding," etc. In Aquetong Hall Ass'n. v. James, 100 Pa. Super. Ct. 440, the court carried the rule so far as to hold that if the plaintiff has made out a prima facie case, error in admission of erroneous testimony will be disregarded. We need not go that far in this case. The general rule just stated has been applied in cases involving objectionable testimony now under discussion. Tartar v. R. Co., 119 Kans. 738, 241 Pac. 246; Alpe v. Coal Company, 208 Ill. App. 67; Smith v. R. Co., 95 Kans. 451, 148 Pac. 769; Reid v. Yellow Cab Co., 131 Ore. 27, 279 Pac. 635, and see A. T. & S. R. R. Co. v. Frazier, 27 Kans. 463. Since Dr. Carr's testimony was not contradicted, as above stated, and since his estimate of disability was based on treatment and on examinations during a much longer duration than that of the other physicians, it is not likely, and we cannot assume, that the jury gave as much credence to the testimony of the latter as to that of Dr. Carr, and if that is true, it is difficult to see how the defendant could have been prejudiced by the objectionable testimony under discussion. Furthermore, it may be noted, that the verdict is moderate, if plaintiff, a young man in his twenties, was disabled to the extent of even the lowest of the estimates made, namely, that of Dr. Steffen, who estimated that plaintiff was disabled fifty per cent. It is apparent that the jury discounted the testimony of all of the physicians, and were more con-

servative than even the physician in whom the defendant itself placed confidence and reliance, and made their own independent appraisal. See Daughin etc. Trust Co. v. Standard Oil Co., 312 Pa. 229, 167 Atl. 287; Joint Highway Dist. v. Ocean Shore R. Co., 128 Cal. App. 743, 18 P. (2d) 413, 422. Hence it is doubtful that we would be authorized to reverse the case on the question of the amount of damages alone, even if defendant complained of the amount of the verdict. But counsel for defendant does not complain thereof; neither the record nor the briefs of counsel for defendant indicate that the verdict is thought to be excessive, and it is held by the courts that in such case evidence going only to the amount of such verdict is harmless and will not be ground for reversal. Degens v. Langridge, 214 Mich. 573, 183 N. W. 28; Weicherding v. Krueger, 109 Minn. 461, 124 N. W. 225; Wrenn v. Furniture Co., 236 Ill. App. 601; Langford v. Kosterlitz, 107 Cal. App. 175, 290 Pac. 80; Leine v. Contracting Co., 134 Mo. App. 557, 114 S. W. 1147, 1150; Peabody etc. Coal Co. v. Yandell, 179 Ind. 222, 229; 100 N. E. 758; Terre Haute etc. Co. v. Frischman, 57 Ind. App. 452, 457, 107 N. E. 293; and see Steelman v. Byrne, 75 Ind. App. 26, 129 N. E. 631 and cases cited.

It follows that the judgment herein should be affirmed and it is so ordered.

BLUME, Ch. J., and KIMBALL, J., concur.

### ON PETITIONS FOR REHEARING

TIDBALL, District Judge.

In the above entitled cases, the Brouilette case being reported in 65 P. (2d) at page 223, and the Ashton case in the same volume at page 235, the plaintiff in error has filed petitions for rehearing, both of which will be disposed of in one opinion, as the cases arise from the same state of facts.

We have carefully examined the petitions and briefs filed in support thereof and we find nothing therein that requires any extended comment. Except for the claim that this Court failed in the original opinions to give due consideration to the authorities cited by the plaintiff in error in its original briefs, the petitions for rehearing and the briefs consist of little more than a reiteration of the position originally taken by the gas company, namely, that the evidence is insufficient. We are still of the same opinion now that we held when the cases were originally decided, that the evidence is sufficient to sustain the juries' verdicts.

In the opinion in the Brouilette case, in discussing the evidence of the plaintiff as to the gas company's having been notified of the gas leakage, we stated that defendant (the gas company) contended that such evidence tended to prove a cause of action different from the one pleaded. Counsel says we erred in that statement; that his contention was and is that the evidence did not tend to prove any cause of action whether pleaded or unpleaded. While we believe that our original statement is correct, nevertheless, what we said in the Brouilette case on this question would be equally applicable under either contention.

Counsel says we gave "full faith and credit" to the testimony of some of the plaintiffs' witnesses. We deny this. We only pointed out that the jury had a right to give credit to the testimony of the plaintiffs' witnesses and that the jury had evidently done so.

We are accused by counsel of not considering the authorities cited by him on the question of failure of proof. In this, he is mistaken. The fact that we did not discuss in our opinion these authorities is no proof that they were not considered. The writer of the original opinions read every case cited by counsel. We did not

discuss them because we deemed it unnecessary and in order to shorten the opinions.

In conclusion, we wish to say that we gave very careful and painstaking consideration to the decision of these cases. Numerous conferences were held to discuss different phases of the cases, and we earnestly and conscientiously endeavored to arrive at the correct solution. We hope we have succeeded, and we believe we did. We see no reason why the rehearing should be granted, and, therefore, the same is denied.

Rehearings denied.

BLUME, Ch. J., and KIMBALL, J., concur.