EDNA BREVDY,

*Plaintiff and Appellant,*

vs.

EDITH REBECCA SINGER and JUNE BREVDY,

*Defendants and Respondents.*

(No. 2581; August 4th, 1953; 259 Pac. (2d) 1087)

For the plaintiff and appellant the cause was submitted on the brief of Greenwood, Ferrell & Williams of Cheyenne, Wyoming, and o r a l argument by A. Joseph Williams.

For the defendants and respondents the cause was submitted upon the brief and also oral argument of Clarence A. Swainson, of Cheyenne, Wyoming.

490

## OPINION

RINER, Justice.

This case comes before this court by direct appeal proceedings from a judgment of the District Court of Laramie County, Honorable Glenn Parker, Judge of the 2nd Judicial District, having been called to sit in lieu of the presiding Judge of the First Judicial District, the Honorable Sam M. Thompson. A jury was summoned to hear the case with Judge Parker and that body rendered a special verdict in favor of the defendants Edith R. Singer and June Brevdy a n d against the plaintiff, Edna Brevdy, as will more particularly appear hereinafter. Upon the rendition of that verdict, the court entered the judgment which is now drawn in question, the plaintiff aforesaid being the appellant and the named defendants, the respondents.

The material facts in the case are comparatively simple and are substantially as follows:

Julius Brevdy was married twice, his first wife having died in 1943. The second wife, Edna, is the plaintiff and appellant herein. By his first wife Julius had three children; his son and two daughters. The son died while a prisoner of war during World War II, the two daughters, June and Edith are still living and are over the age of 21 years. When Julius married his second wife, Edna, the plaintiff below, he was 62 years old. She already had two children by her first husband who had died previously of a heart ailment. These

children were of age; were married and did not live with their mother. She met Julius May 15, 1947, and married him a little over a month later, towit, on June 19, 1947. She became his widow in consequence of Julius Brevdy's suffering injuries in an automobile accident in California which were so severe that he died at Beaumont in that state on December 5, 1950. The remains were returned to Cheyenne for interment and the estate of Julius Brevdy was probated in the District Court of Laramie County. The two real estate properties mentioned below were not included in that estate.

On June 4, 1947, Julius Brevdy had executed two deeds. One of these instruments conveyed certain property in Cheyenne, Wyoming, usually referred to in the record as the Farmers Exchange property to his daughter, the defendant, June Brevdy; the other deed also conveyed real property in Cheyenne, that property being designated usually as the South Side property and designated therein his other daughter, Edith Rebecca Singer, as the grantee; that on the day these two conveyances were executed Julius Brevdy delivered them to his attorney, Howard B. Black, with written instructions to the latter directing the said attorney to deliver the two deeds to the several grantees therein upon the death of the grantor, Julius Brevdy.

The record discloses very clearly that these two pieces of real estate above mentioned were accumulated and acquired over the years through the efforts of Brevdy, his first wife and their children. On May 1, 1950, Julius came to Mr. Black and advised the latter that he had sold the Farmers Exchange property. This sale was consummated with the full and express consent of June Brevdy, the grantee thereof as hereinbefore set forth, in the deed which had been delivered

to Mr. Black relative to the Farmers Exchange property.

At the instruction of Julius Brevdy, Mr. Black thereupon removed the deed to the South Side property from the envelope where it had been kept by him since it had been executed as described above. Julius Brevdy then directed Mr. Black to add the name of June Brevdy as another grantee; her name being added to that of her sister, Edith, to this deed to the South Side property. Mr. Black obeyed his instruction and thereupon his client, Brevdy, initialed the latter's approval thereof. A new letter of instruction to Mr. Black was immediately drawn reading:

> "Howard B. Black
> Attorney at Law
> 527 Hynds Building
> Cheyenne, Wyoming.

May 1, 1950.

Mr. Howard B. Black
Cheyenne, Wyo.
Dear Mr. Black:

I have had in your hands since June 4th, 1947, a certain warranty deed to Lots 21 and 22, in Block 565 in South Cheyenne, City of Cheyenne, Laramie County, Wyo. This deed is made out to my daughters Edith Rebecca Singer and June Brevdy and it is my wish and direction that upon my death this deed be delivered to my two daughters mentioned above.

Very truly yours,

(signed)    Julius Brevdy."

When this had been done Mr. Black replaced the deed with the two grantees therein named in the original envelope and put it and its contents back in his office safe. Neither the grantor nor the grantees had access to this envelope or the deed from that time on

until after Julius Brevdy had passed away as heretofore stated. After Julius Brevdy's death, Mrs. Brevdy with June and Edith went to Mr. Black's office where, pursuant to the instructions contained in J u l i u s Brevdy's letter to Mr. Black hereinabove set forth, the latter delivered that deed to the two daughters, June and Edith, who took it to the Laramie County Clerk's office in Cheyenne and caused it to be recorded December 11, 1950.

The second wife, Edna, then Julius Brevdy's widow, commenced an action in the District Court of Laramie County on February 6, 1951. She filed a second amended petition to which defendants filed their answer. Upon these pleadings as subsequently modified the case was tried. The plaintiff, Edna Brevdy, demanded a jury trial for the issues raised. This demand was resisted by the defendants and the court ruled that plaintiff could have a jury trial on the question raised by the pleadings as to whether the deed to the South Side property was invalid on account of its not having been properly delivered. The pleading of the plaintiff also raised the question as to whether plaintiff had been defrauded of her property rights as wife and widow of Julius Brevdy by reason of the latter's representations to her as to the property he owned previous to their marriage in June 1947. The plaintiff accordingly was put to her election whether she desired a jury trial as to the delivery of the deed after Brevdy's death or preferred to have the issue of fraud tried by the court. She chose to have a jury trial on the validity of the deed to the South Side property and insisted on her claim it was invalid on account of its not being properly delivered. Accordingly that is now the controlling question in the case: whether the deed was properly delivered to the grantees so as to vest them with title to the property involved.

On the conclusion of the trial the jury rendered a special verdict as already stated which read:

"A request having been made of the Court to have the jury instructed to make special findings upon the following questions of fact, you are instructed to answer the following two questions:

1. Question: When Julius Brevdy left the deed in question with his attorney, Howard Black, did he intend to place the deed completely beyond his control forever and to make an irrevocable and final gift of the property to his daughters with the intent that title in the property would pass immediately to his daughters?

(Your answer shall be yes or no.)

1. Answer: Yes

2. Question: Was it the intention of Julius Brevdy, in placing the deed with his attorney, to retain control over the deed during his lifetime, to sell the property if he had had the opportunity to do so, and for the deed to be delivered to his daughters after his death if he had not sold the property during his lifetime?

(Your answer shall be yes or no.)

2. Answer: No.

(Signed) Harry J. Hall
Foreman"

and upon this verdict the court entered the judgment of which complaint is in these proceedings made.

It is asserted that the judgment is contrary to law and unsupported by the evidence. Under such circumstances where the facts are found by the jury as well as where they are found by the court the rule adopted by this court as so often stated is that:

" 'In this connection (where it is claimed the judgment is not sustained by sufficient evidence) it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is

true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.' " (Northwest States Utilities Company v. Brouilette, 51 Wyo. 132, 149-150; 65 P (2d) 223.)

This was a case where judgment was entered upon the verdict of a jury.

A more detailed description of the Farmers Exchange property is: Lot 8, Block 395 in the City of Cheyenne, County of Laramie, State of Wyoming. The description of the so-called South Side property in the deed now involved in the instant litigation is:

"Lots 21 and 22, Block 565, in South Cheyenne, being re-plat of the East 48 feet of Lot 8, in Block 565, City of Cheyenne, County of Laramie, State of Wyoming."

On the issue concerning which the jury made its finding as above set forth after hearing all the evidence submitted, it will be quite sufficient to review the testimony of several witnesses as follows:

JUNE BREVDY, one of the daughters of Julius Brevdy, as hereinabove recited testified that she is a graduate of the University of Wyoming, in Laramie; that she had a younger sister Harriet, an older sister Edith Rebecca and a brother older than Edith. June stated her brother died as a prisoner of war in World War II. She stated that she is acquainted with the property known as Farmers Exchange and is also familiar with the South Side property that has been mentioned above in this case. Plaintiff's exhibit "1" covers the property on the South Side. June said that the first time she saw the deed was when Mr. Black gave it to her and her sister, Edith, after her father had died, and that this transaction occurred the Monday after her father passed away. She first learned of this deed

after her father married the plaintiff, and that he told her of the existence of the deed. The date of the deed in question to the South Side property is the 4th day of June, 1947. That it was in December 1947 that her father told her about this particular deed. He mentioned another deed to the Farmers Exchange property. Her father told her that before he was married to her stepmother he had made out deeds to her sister Edith and herself for property that was in his name but which he had bought with the money that he had had from her mother and he thought that Edith and June should have it. June stated that her father prior to his marriage to the plaintiff in this case received money or evidence of value from her (June); that she does not know the exact amount of money which she gave her father. Her father moved to California to stay, in the year 1949, and it was in the fall; that she herself went to California to visit her father for the first time in April 1950. She stayed in California with her father who was living with the plaintiff herein in Beaumont, California. The property where they were living in California was a small property with a business on the front thereof, that being separated from the living room quarters; there was a store there; witness thought it was a radio shop or something like that. There was a house on the property with two bedrooms, a living room and kitchen. She stayed there for almost two weeks. Afterwards she and her father drove to Cheyenne in his automobile. That the reason they went to Cheyenne was because her father was worried about the renters. The situation regarding the renters was discussed as they were not paying regularly; her father asked her if she thought they should sell the property and she said "Yes." Her father said if it was all right he would look for someone to sell it to, since she (June) could not stay any longer as her

leave was up. She told her father she could come back to Cheyenne, if it was necessary, when the property was sold. She stated she was working for the army in Rock Island, Illinois; she stated also that she did not come back to Cheyenne at that time. After she had gone to Rock Island her father called her and told her that he had a customer to whom he could sell the property and pay off the mortgages on the other property on the South Side. Her father asked her if she thought that was all right and she said "yes." He also told her that he did not think it would be necessary for her to come back to Cheyenne to sign any papers. After he had sold the property he told her he had done so. He took the money obtained from the sale and paid the mortgages off that were on the South Side property. It was a $10,000 mortgage which was paid off by him.

The next occasion on which she saw her father was at the time he died and she was visiting him in California. The day he died he told her that he had sold the Farmers Exchange property and that he had added her name to the other deed to the South Side property. She testified that the family moved to the 16th Street property when she, June, was in high school and they lived there through her second year of college . . . about four years in that location. The family consisted, at that time, of her sister Edith, her mother and herself together with her father. They lived in the back of the house so that they could work more easily. The entire family as above constituted handled the work in the store. Her mother worked in the store and also her sister Edith and she herself did. This situation was also true when the family lived at the airport store. When she graduated from college she was earning $210 a month working for the Highway Department. When she went to Minneapolis she re-

ceived $3,200 a year, and that at the time she testified she was making around $5,000 a year working for the Government as an hydraulic engineer. Her conversation with her father in December 1950 was had before he had been struck by the automobile. The Farmers Exchange property was covered by a deed with her name on it and it had been sold in the Spring of 1950 with her consent.

That the people who rented the Farmers Exchange property paid the rentals into the bank; that her father told her that in return for the Farmers Exchange property her name was put with the other one on the South Side property deed so there would be no outstanding mortgage and her n a m e and her sister's (Edith Rebecca's) would be together on the deed to that property and also that her father intended to take the remainder of the money left after the mortgage was paid off to California and reinvest it for her.

EDITH REBECCA SINGER testified that she was living in Los Angeles, California, and had lived there since August 1950. Prior to August 1950 she lived in the house on 16th Street in Cheyenne for a good many years. That Julius Brevdy was her father. That the plaintiff in this lawsuit was her stepmother. She stated it was not true that her father had given her a piece of property on East 16th Street. In May or June of 1947 she loaned $3,000 (obtained from her first husband's estate) to Julius Brevdy, her father. That she was familiar with the property known as the South Side property in this case and also with the Farmers Exchange property. Her father acquired the South Side property after the family had sold the business at the Farmers Exchange and leased the store. That she was in the business with her father and worked in the store. Edith stated also that her mother, her brother and her

sister, June, worked in the store. Her father had been in business in another location prior to that time, and ran the airport store, the Airport Lodge, and that the family at that time lived in back of the store which was a grocery store and filling station with cabins. That she was employed in that store; her mother and father, her brother and she and her younger sister worked in the business at the Airport Lodge and did all the work around there. They lived there about five or six years. She lived on the South Side property in May 1947 until about November of that year at which time she was married. At that time there was just the house and the filling station. Her husband and herself were living in the house and they were running the filling station. In November 1947 she and her husband moved to an apartment in the house at 16th and Morrie Streets. Edith stated she knew about the deeds to the South Side property and the Farmers Exchange property prior to the time Mr. Black delivered them to her and her sister. Her father's age at the time of death was 65 years and he was 62 in 1947. Both she and her sister June were children when the family moved from the Airport Lodge to the Farmers Exchange property. She was about 25 or 26 years old when she married her first husband in 1945 and that she married her second husband in 1947. Edith testified that her father supported June while she was in college. June was 18 years old when she commenced going to college.

HOWARD B. BLACK, the attorney for Julius Brevdy at the time the transactions involved in this litigation occurred, testified that he had been a practicing attorney in Wyoming since 1921 or 1922. He was admitted to the practice both in Wyoming and in Montana. He represented Julius Brevdy at different times and especially on or about June 4, 1947. On that day

Mr. Black saw Julius Brevdy when he came to the former's office. Mr. Brevdy requested that Mr. Black draw some deeds for him. Mr. Julius Brevdy asked him to draw two deeds which Mr. Black did and Brevdy explained to him why he wanted the deeds drawn. Julius Brevdy told him that he was planning on getting married; that some of the members of his church had arranged a marriage between him and a widow woman who had children, and that he himself had children and that he wanted to make some disposition of certain pieces of his property before he got married, so that he would be sure his two daughters would receive something from his estate. Brevdy said he had talked it over with his intended wife and she understood the situation and he (Brevdy) felt that it was only right that his two daughters should have some of this property; that they helped to accumulate it while he and his former wife were alive. Brevdy also said he would provide for his present wife in that if he lived with her for a long time he would make additional allowances for her from his estate. Julius Brevdy at that time was somewhere in the neighborhood of 60 years, between 60 and 62. Plaintiff's exhibit "1" is the deed to the South Side property. The other property was the Farmers Exchange down on 16th Street in Cheyenne. At that time Mr. Black prepared this deed, plaintiff's exhibit "1" and also prepared a deed for the property known as the Farmers Exchange on 16th Street. Mr. Black testified that his name appears as a witness on the deed to the South Side property and the grantees are Edith Rebecca Singer and June Brevdy. On June 4, 1947, Edith Rebecca's name was on the deed to the South Side property at that time. The grantee in the other deed for the Farmers Exchange property was June Brevdy. Julius Brevdy executed that deed; Mr. Black recalls seeing Julius Brevdy

execute the two deeds. When the two deeds were prepared and executed they were placed in an envelope and Julius Brevdy's name was written on the outside of the envelope and they were placed in an envelope with a letter of instruction which Mr. Black requested Julius to give him so that it would be plain what Black's duties were in the matter. Julius Brevdy told Mr. Black he wanted the latter to make out the deeds and that he wanted to deliver them to Black and wanted Black to keep them until his death and upon his death he, (Black) was to deliver them to the two girls, his daughters. Mr. Black told J ulius Brevdy that he would do that and he put them in his office safe. Julius Brevdy was advised by Black after he had delivered the deeds to the latter and put them under his control that they would be kept in his (Black's) safe until Julius Brevdy died and after his death they would be delivered to the parties as directed and that that would be a good delivery to Black. Julius Brevdy said that was what he wanted to do and he understood that he could do that. Mr. Black testified he does not have a copy of the first letter which Brevdy gave him. The letter which Brevdy gave Mr. Black on June 4, 1947, was placed in the safe with the two deeds.

Mr. Black stated that the next time he saw the deed was when Brevdy came in and told him that he had sold the farmers Exchange property. Black did not know that he was going to sell anything. That was on or about May 1, 1950. He had a conversation with Mr. Brevdy on May 1, 1950, when Brevdy told Mr. Black that he had sold the Farmers Exchange property; he also stated he had been having trouble with the tenants at that property; Brevdy told Black he was having so much trouble he guessed he would have to sell the Farmers Exchange property and that he had talked it over with June and he decided to sell it and he said

then that he wanted to add June's name on to the other deed for the South Side property, plaintiff's exhibit "1". At that time Mr. Black wrote her name on the South Side property deed and had Brevdy initial it to show that he had made this change. That Mr. Black did not part with possession of that deed at that time. That he never had parted with possession of the deed. He put the deed in typewriter and added June's name to it and then called Mr. Brevdy over to his desk and asked him to initial it. Mr. Black then put the instrument back in his safe. Julius Brevdy told Black he wanted that deed delivered upon his death to June and Edith, his two daughters. That Black told Brevdy he thought he should give him (Black) a new letter of instruction concerning the deed so that it would be clear what Brevdy wanted done and that Black then put the deed in an envelope and put it in his office safe. Brevdy said that would be fine so Black prepared the letter set forth above and Julius Brevdy signed it.

Mr. Black then put the letter, signed by Julius Brevdy, and this deed to the South Side property in an envelope and placed the envelope in his safe. The next time he had occasion to take the envelope from the safe was after Julius Brevdy's death and after his funeral and at that time he delivered the envelope containing the deed and the letter to the two girls named in the deed, June Brevdy and Edith Rebecca Singer. The two girls were present at that time but Mr. Black does not think that the plaintiff was present. After May 1, 1950, when Mr. Brevdy deposited this letter and the deed with him he had no business dealings with Brevdy that Blacks recalls. Mr. Black testified that Julius Brevdy never regained the letter or the deed from him, as above mentioned. The deed to the South Side property remained in Black's possession intact until after Brevdy's death. Mr. Black was the admini-

strator and the attorney for the probate of Julius Brevdy's estate in Cheyenne, Wyoming. The final report of distribution of Brevdy's estate stated that there was a balance of $3,063.22, one half was to be paid to Mrs. Edna Brevdy, one quarter to Mrs. Edith Rebecca Singer and one quarter to Miss June Brevdy, the legal heirs of said deceased. These payments were made and receipts given for those sums.

With the testimony of these witnesses before us it is appropriate to ascertain whether the delivery of the deed to the South Side property by Mr. Black under the instructions and circumstances as detailed by the witnesses aforesaid was proper.

We find in 16 Am. Jur. 517-518 § 143 that the text upon an authoritative and very long list of cases from the appellate courts of this country states the rule to be:

"It is well established that an effective legal delivery of a deed may be made by the grantor's manual delivery of the deed to a third person, with directions to the latter to hold the deed during the lifetime of the grantor and upon the latter's death to deliver it to the grantee, intending at the time of the delivery to the custodian to part forever with all right or power thereafter to repossess, retake, or control the deed. Such a delivery is effectual to convey title to the grantee upon the grantor's death, although the grantee is not aware of the delivery until after the grantor's death, and the grantor cannot after making such delivery to a third person recall, revoke, or modify the deed without the consent of the grantee, although the deed is gratuitous."

We find also that 26 C.J.S. 247, § 46 is in accord with the foregoing statement of the law, employing the following language:

"The delivery of a deed by the grantor to a third

person to be held by him and delivered to the grantee on the grantor's death will operate as a valid delivery, where there is no reservation on the part of the latter of any control over the instrument, ***"

Supporting this view of the law that text supplies citations to cases in the Appellate Courts of more than 25 states of the Union.

Under these authorities taken in conjunction with the evidence hereinabove reviewed and the findings of the jury both affirmative and negative hereinbefore set forth we are obliged to conclude that there is no reversible error and the judgment should be affirmed. Other minor points than those discussed above have been urged by appellant but we have examined them all and find them to be without merit. To review them all would be to unduly lengthen this opinion and would serve no useful purpose. The judgment in question should be affirmed.

Affirmed.

BLUME, C.J., and HARNSBERGER, J., concur.